## LITTLE CAHABA COAL CO. et al. v. UNITED STATES.

(District Court, N. D. Alabama. S. D. November 9, 1926.)

Nos. 3153 and 3154.

1. **Internal revenue ⬒⇒38(4)—Only remedy of taxpayer seeking to recover taxes paid on additional assessment before creation of Board of Tax Appeals, and whose case depends on proper deduction for invested capital, is by direct action.**

Board of Tax Appeals, established under Revenue Act 1924 (43 Stat. 253), in place of Committee on Appeals and Review, having no jurisdiction or authority to hear and determine question of refund of income and profits taxes, already paid on additional assessment made before board's creation, so that taxpayer has no opportunity to have merits of its case, depending on proper deduction for invested capital, determined by any authority in the Treasury Department on the question of value, except by government valuation engineer, the only remedy is by direct action to review his decision.

2. **Internal revenue ⬒⇒9(27)—Coal mines reach stage of production when output allows profit on capital invested, so that further expense of sinking slopes is not invested capital for excess profits tax (Revenue Act 1917, §§ 203, 207 [Comp. St. §§ 6336⅜d, 6336⅜h]).**

Coal mines reach stage of production when in their operation output of coal is such as to allow them to pay dividend or profit on capital invested, so that expense of further sinking producing slopes is not invested capital within Revenue Act 1917, §§ 203, 207 (Comp. St. §§ 6336⅜d, 6336⅜h), relative to deduction from income for tax purposes.

3. **Internal revenue ⬒⇒38(12).**

Coal mine owners *held* not to show that they should be allowed for income tax purposes to capitalize their tenant houses at more than cost shown by their books.

At Law. Consolidated suits by the Little Cahaba Coal Company and by the Blockton Cahaba Coal Company against the United States. Judgment for the United States.

W. S. Pritchard and John D. Higgins, both of Birmingham, Ala., for plaintiffs.

C. B. Kennamer, U. S. Dist. Atty., of Guntersville, Ala., and J. S. Franklin, Asst.

U. S. Dist. Atty., of Birmingham, Ala., A. W. Gregg, Solicitor of Internal Revenue, and Ralph E. Smith, Special Atty. for Internal Revenue Bureau, both of Washington, D. C., for the United States.

CLAYTON, District Judge. The above-stated suits were brought under paragraph 20, § 24, of the Judicial Code as amended, Comp. St. Supp. 1925, c. 2, § 991 (20a), and are for the recovery of income and profit taxes alleged to have been erroneously collected by the defendant from the plaintiff corporations for the tax year 1917. The taxes were assessed under the Revenue Act of that year. John D. McNeel was the collector of internal revenue who assessed and collected the taxes, and W. E. Snead, at the time of the entry of the suits, was his successor.

The cases were consolidated without objection and tried together. The stock ownership of each corporation, and the law and the material facts in each, are practically the same. After the amended complaints were filed, the demurrers to the originals were withdrawn, and the defendant pleaded in each case in short by consent the general issue. So that, as a matter of law arising from the pleadings, it is conceded that the suits are well brought; and the cause is now upon the merits.

The questions are: (1) The amount at which the plaintiffs should be allowed to capitalize their three separate mining slopes; (2) The cost price at which they should be allowed to capitalize their tenant houses; and (3) whether plaintiffs' exemption rate should be 9 per cent., the maximum allowed by the statute, or 7 per cent., the minimum.

The plaintiff corporations filed, as required by law, their respective federal income and profit tax returns for the year 1917, within the time prescribed by statute. The consolidated items in such returns are:

Total income and profits tax 1917.......... $ 25,018 89
Income 1917................................... 145,209 54
Invested capital 1917......................... 848,384 30

The corporations voluntarily paid the tax as calculated by them in this original return, $25,018.89, to McNeel, collector of internal revenue, on March 28, 1918. Notation is stamped across the face of the original return of the parent corporation, "Closed no tax due, Consolidated Returns Audit Division, Little Cahaba Coal Company parent or principal company." It may be inferred that this stamp was placed upon the return by one of the defendant's auditors at Washington after the cases had been consolidated, and after the returns had been filed, for a photostatic copy of the original return had from the Washington bureau, and a part of the evidence here carries that stamp. It at least tends to show that at first the defendant found no tax due upon an audit of the taxpayer's return at Washington after the consolidation of the two cases there. It is not controverted that the original returns as prepared by the taxpayer are in accord with the taxpayer's books. Therefore it was necessary, before the government could collect the additional tax, the subject-matter of this controversy, for it to adjust and make changes in the taxpayer's original books and figures and values.

Accordingly the defendant, by its agents Mobley and Perry, made a field audit and report upon the taxpayer corporations. On April 22, 1921, following the report of such revenue agents, defendant published a letter giving the following figures, divergent from those of the taxpayer's books as shown by the original return, as its true income, capital and taxes for the year 1917. These are the figures as given by the taxpayer, as found by the defendant, and the difference:

|  | Taxpayer's Figures. | Revenue Agents' Figures. | Difference. |
| --- | --- | --- | --- |
| Total tax.......... | $ 25,618 89 | $ 56,526 81 | $ 31,507 92 |
| Invested capital.. | 848,384 30 | 586,531 68 | 261,852 62 |
| Income .......... | 145,209 54 | 197,522 20 | 52,312 66 |

The additional tax as shown above, $31,507.92, results, of course, from the changes made by the defendant's agents in the taxpayer's book figures and their original returns. This additional tax was assessed, and was on July 15, 1921, paid to McNeel, then the collector of internal revenue. The consolidated suit is to recover of the United States the sums of $13,894.35 in behalf of the Little Cahaba Coal Company and $5,391.08 in behalf of the Blockton Cahaba Coal Company, aggregating $19,295.43, alleged to have been wrongfully exacted, with interest thereon at the statutory rate of 6 per cent. from July 15, 1921, the date of payment.

The subject-matter of this suit involves the application of the provisions by which the deduction from income for the purpose of tax is measured by the "invested capital" of the taxpayer; and the provisions of the Act of October 3, 1917, relating to deductions are:

Section 203: "That for the purposes of this title the deduction shall be as follows, except as otherwise in this title provided—

"(a) In the case of a domestic corporation, the sum of (1) an amount equal to the same percentage of the invested capital for

the taxable year which the average amount of the annual net income of the trade or business during the prewar period was of the invested capital for the prewar period (but not less than seven or more than nine per centum of the invested capital for the taxable year), and (2) $3,000. * * *" Comp. St. § 6336⅜d.

The provisions of the act relating to invested capital are:

Section 207: "That as used in this title, the term 'invested capital' for any year means the average invested capital for the year, as defined and limited in this title, averaged monthly. * * *

"(a) In the case of a corporation or partnership: (1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor), and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year. * * *" Comp. St. § 6336⅜h.

Accordingly, Regulations 33 and 41 were adopted under the Acts of 1917, and it follows that under such regulations made in pursuance of the acts this controversy must be tried.

Section 207 of the Revenue Act of 1917, subd. (a), quoted above, defines invested capital under three numbered headings, only two of which need be here discussed: "(1) Actual cash paid in;" and "(3) Paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year. * * *" The meaning of clause 1 is simple. Articles 62 and 64 of Treasury Department Regulations 41 define clause 3 as follows:

"Scope of Phrase 'Surplus and Undivided Profits.'—Clause (3) of subdivision (a) of section 207 authorized the inclusion in invested capital of earned surplus and undivided profits, used or employed in business. Inasmuch as section 201 provides that all the income of a corporation or partnership shall be deemed to be received from its trade or business, all the surplus and undivided profits of a corporation or partnership (exclusive of

15 F.(2d)—55

undivided profits earned during the year), from whatever source derived, will, unless invested in stocks, bonds (other than obligations of the United States) or other assets, the income from which is not subject to the excess profits tax, be deemed to be used or employed in the business and may be included in the invested capital.

"Reconstruction of Surplus and Undivided Profits Accounts.—Where through failure to provide for depletion, depreciation, obsolescence, or other expenses or losses, or where for any other cause or reason the books of account of the taxpayer do not show the true paid-in or earned surplus and undivided profits, in the computation of invested capital such adjustments shall be made as are necessary to arrive at a statement of the correct amount.

"Where a taxpayer claims additions to the capital accounts, the books of account will be presumed to show the true facts and the burden of proof will rest upon the taxpayer. Such additions will be accepted only to the extent and under the conditions stated below:

"(1) Amounts which have been expended in the past for the acquisition of plant, equipment, tools, patterns, furniture, fixtures, or like tangible property, having a useful life extending substantially beyond the year in which the expenditures were made, and which have been charged as current expense, may (less proper reduction for depreciation or obsolescence) be added to the surplus account in computing the invested capital when such assets are still owned and in active use by the taxpayer during the taxable year.

"The taxpayer shall in his return to the commissioner of internal revenue make a statement of the proposed additions, specifying the kinds and amounts of property involved, the years in which the expenditures were made, and the method followed in distinguishing between capital outlays and current expenses.

"The taxpayer shall also show that adequate provision has been made for the depletion, depreciation, or obsolescence of such of the assets so acquired as are, under the rulings of the department, subject to recognized depreciation."

Under the sanction of the Secretary of the Treasury, the commissioner of internal revenue published Regulations 45 in pursuance of the Revenue Act of 1918. On the trial, counsel for the respective parties admitted that article 222 of Regulations 45 was more explicit than preceding regulations in

regard to determining allowable additions to capital. Article 222 provides:

"*Allowable Capital Additions in Case of Mines.*—(a) All expenditures for development, rent, and royalty in excess of receipts from minerals sold, shall be charged to capital account recoverable through .depletion, while the mine is in the development stage. Thereafter any development which adds value to the mineral deposit beyond the current year shall be carried as a deferred charge and apportioned and deducted as operating expense in the years to which it is applicable.

"(b) All expenditures for plant and equipment shall be charged to capital account recoverable through depreciation, while the mine is in the development stage. Thereafter the cost of major items of plant and equipment shall be capitalized but the cost of minor items of equipment and plant, necessary to maintain the normal output, and the cost of replacement may be charged to current expense of operation.

The Supreme Court, construing section 207 of the Revenue Act of October 3, 1917, has said:

"The Revenue Act of October 3, 1917, passed after we have become engaged in the war, took the place of the Act of March 3d, and embodied a 'war excess profits tax' with higher percentages imposed upon the income in excess of deductions and a more particular definition of terms. A scrutiny of the particular provisions of section 207 shows that it was the dominant purpose of Congress to place the peculiar burden of this tax upon the income of trades and business exceeding what was deemed a normally reasonable return upon the capital actually embarked. But if such capital were to be computed according to appreciated market values based upon the estimates of interested parties (or whose returns perforce the government must in great part rely), exaggerations would be at a premium, corrections difficult, and the tax easily evaded. Section 207 shows that Congress was fully alive to this and designedly adopted a term—'invested capital'—and a definition of it, that would measurably guard against inflated valuations. The word 'invested' in itself imports a restrictive qualification. When speaking of the capital of a business corporation or partnership, such as the act deals with, 'to invest' imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of

permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains. See Webster's New Internat. Dict. 'Invest,' 8. * * * " La Belle Iron Works v. U. S., 256 U. S. 377, loc. cit. 387, 41 S. Ct. 528, 530 (65 L. Ed. 998).

The questions before this court with reference to invested capital are whether the plaintiffs have established by the evidence that they are entitled to include for invested capital purposes a greater amount for cost of development of mine slopes than was allowed by the commissioner of internal revenue; and whether plaintiffs have established by the evidence that they are entitled for invested capital purposes to a greater amount for tenant houses than was allowed by the commissioner of internal revenue.

In writing the Income Tax Law, it was recognized that the taxpayer should be entitled to certain deductions for depreciation on buildings, machinery, equipment, etc., and a certain amount for depletion in case of mines, oil, and gas wells and timber properties. For the purpose of computing depreciation and depletion, it was necessary to fix a basic date. Accordingly, March 1, 1913, value was fixed for depreciation and depletion purposes in case of properties acquired prior to that date.

Paragraphs 7 and 8 of section 5 (a) and paragraph 2 of section 12(a) of the Revenue Act of 1916 (Comp. St. §§ 6336f, 6336l), authorized individuals and corporations to deduct from their gross income "a reasonable allowance for the exhaustion, wear and tear of property, * * * " and "(b) in the case of mines a reasonable allowance for depletion thereof not to exceed the market value in the mine of the product thereof which has been mined and sold during the year for which the return and computation are made. * * * " It was provided that, when the sum of annual allowances for depletion equaled the capital originally invested, or, in case of purchase prior to March 1, 1913, the fair market value as of that date, "no further allowance shall be made."

It was evident that under the Revenue Act of 1917 it is of benefit to the taxpayer to fix the invested capital at the highest allowable figure, for its exemption for income and profit purposes is based upon a percentage of its invested capital.

[1] The Committee on Appeals and Review was the final Board of Appeals up to the time the Board of Tax Appeals was established

in the place of the committee. The committee consisted of lawyers and tax experts especially selected by the commissioner of internal revenue, with the approval of the Secretary of the Treasury. And its duty was to hear appeals from rulings of the income tax unit. This committee was composed of some fifteen members, and sat in sections. Later, under the Revenue Act of 1924 (43 Stat. 253) Congress established the Board of Tax Appeals. The jurisdiction of this board has been construed to be limited to authority to hear matters involving additional assessments of federal income taxes before payment on assessments made after the board was created. The board has no jurisdiction or authority to hear and determine the matter involved in this controversy, which is solely a question of a refund of taxes already paid upon an additional assessment made before the board was created. For this reason the taxpayer had no opportunity to have the merits of its case determined by any authority in the Treasury Department on the question of valuation, except by a single person, namely Mr. du Rell, government valuation engineer. Plaintiff had no remedy except to bring this suit to review his decision. The committee had authority under the law to hear and determine controversies relating both to refunds and to additional assessments in income tax cases.

The taxpayer here, in endeavoring to get relief claimed, employed a mining engineer, Mr. Cowin, to make an appraisal. And this retrospective appraisal was made pursuant to a general and express holding made by the committee, as follows:

"The committee has made an exhaustive study of appraisals and their relation to invested capital of corporations. It has also considered appraisals in connection with establishing March 1st values for purposes of depreciation and depletion, and for purposes of establishing certain values in connection with amortization claims, and has reached the conclusion that retrospective appraisals may properly be accepted as a basis for the allowance of a paid-in surplus. In making such an appraisal, care should be exercised in order to value the assets in question at cost, and to eliminate any appreciation written upon the books of the corporation since the date of acquisition. It will be necessary to inventory at cost as of basic date (for invested capital purposes, the date of acquisition) the date of renewal, and the cost, of additions made subsequent to the date the property was paid in. Adjustment should be made for property scrapped or discarded and for depreciation. The books of account, if available, should be considered the best evidence as to the date of acquisition and actual cost. The assets accounts may be incomplete for many reasons, and may include property still on the books that has been discarded. The tangible property actually in existence and in use should be considered as the basic evidence of the invested capital in existence, and should be used as a basis for the proper correction of the accounts to reflect the actual investment in the depreciable properties in existence during the taxable years. The burden of proof is upon the taxpayer when a claim for paid-in surplus is made. A retrospective appraisal is in substance the opinion of experts based upon the facts presented to them, and as such is admissible as evidence of a paid-in surplus, but its value as proof of a paid-in surplus must depend upon the truth of the facts upon which it is based. In order, therefore, for the bureau to accept as conclusive a retrospective appraisal, it must be satisfied that the facts upon which the appraisal is based are true. The bureau should accept such proof of the facts as is ordinarily accepted in business transactions, and must receive and consider such appraisals with a sound and intelligent discretion, without being able to prove their accuracy, as mathematicians judge accuracy, if they convince the mind of their correctness to that moral certainty upon which practical men of affairs act. It has been the policy of the bureau to construe strictly the requirements of article 63 of Reg. 41 and art. 836 of Reg. 45, and numerous retroactive or retrospective appraisals have been rejected as a result of such construction. This practice should be discontinued." Comm. Rec. 747, 1–1 C. B. 353.

It is established that the decisions of the commissioner of internal revenue in the assessment of federal estate taxes are not conclusive on courts, but the District Court has jurisdiction to try de novo suits for recovery of excess payments of federal estate tax, after the taxpayer has taken necessary steps before appealing to the court. Fidelity & Columbia Trust Co. v. Lucas (D. C.) 7 F. (2d) 146.

The plaintiffs cite section 177 of the Judicial Code, as amended by section 1324 of the Revenue Act of 1921, and re-enacted without change in section 1020 of the Revenue Act of 1924 (Comp. St. § 1168) which provides that "interest may be allowed in any judgment of any court rendered after the passage of the Revenue Act of 1921 against

the United States for any internal revenue tax erroneously or illegally assessed or collected, or for any penalty collected without authority or any sum which was excessive or in any manner wrongfully collected, under the internal revenue laws." But in my view of this case it is not necessary to consider the matter of interest.

When defendant's agents originally audited plaintiffs' books, no allowance was made for capitalization of plaintiffs' three mine slopes. Afterwards plaintiffs made claim for a refund of a portion of the excess profits tax paid, basing this claim partly upon the cost of sinking their mine slopes. However, the parties have previously agreed upon a basic rate for the capitalization of the cost of each of the three slopes; the figures agreed upon being approximately as follows:

Slope No. 1, Little Cahaba.... $ 63 00 per linear yard
Slope No. 2, Little Cahaba.... 103 00 per linear yard
Slope No. 3, Blockton Cahaba　87 00 per linear yard

Plaintiffs contend that the slopes should be capitalized to the respective depth they had been sunk as of March 1, 1913, and that the mines did not pass from the development stage to the stage of production until that time. They introduced several witnesses experienced in mine construction and operation, including the vice president and manager of the mines involved in this case, and the president of the Roden Coal Company, which owns mines near those of plaintiffs. The testimony of these witnesses differed materially as to when a mine passed out of the stage of development, where they were allowed to capitalize the expense of constructing the mine slopes, and entered a stage of production, where the cost of further development should be charged to expense. Each testified that in his opinion these mines did not pass out of the development stage before March 1, 1913. Two of the witnesses testified that the mines should be allowed to capitalize the construction of the mine slopes through to the boundary of the property, or until a point is reached where all the coal available to a slope can be reached from it. One witness testified the construction of the slopes should be capitalized until the mines had reached their maximum production; while another testified the mines should not only reach their maximum production, but the slopes should be pushed far enough in advance for that maximum production to be maintained before the slopes should cease to be capitalized.

These opinions of the expert witnesses have been given respectful consideration.

But no adjudicated case or specific ruling has been furnished or found to sustain such views. And I think that public policy back of the income tax law, and the law itself, are in conflict with such opinion conclusions.

[2] Defendant contends, and I approve the contention as a reasonable interpretation of the law, that the mines reached a stage of production at the time when in their operation the output of coal was such as to allow the mines to pay a dividend or profit on the capital invested.

If plaintiffs' theory were accepted, it might be possible for a mine to operate until its property should be entirely exhausted, and charge the whole cost of extending mine slopes to development, and avoid the tax by reason of the fact that the output of the mine had not reached the maximum for which the slopes were designed to produce, although it might be returning a profit each year.

It developed in the testimony in this case that two of the three mine slopes in question entered on the outcrop, and, therefore, produced coal from the very beginning of operations, though, necessarily, they could not produce enough coal to pay the cost of the development until they had advanced far enough for headings and rooms to be opened up, allowing a larger number of miners to work and substantially increasing the production.

Plaintiffs insist they should be allowed to capitalize the cost of the slopes as follows:

Slope No. 1, Little Cahaba,　6,000 feet
Slope No. 2, Little Cahaba,　4,000 feet
Slope No. 3, Blockton Cahaba, 3,860 feet

These figures represent the depths to which the respective slopes had been carried March 1, 1913. Defendant refused to allow capitalization to those depths, but did allow approximately the following:

Slope No. 1, Little Cahaba,　2,000 feet
Slope No. 2, Little Cahaba,　1,600 feet
Slope No. 3, Blockton Cahaba, 1,500 feet

The figures allowed by the defendant for slopes 1 and 2 represent approximately the depths to which they had been carried in 1906. In that year the Little Cahaba Coal Company declared a dividend of $60,000, which defendant insists indicates that it had then reached a stage of production, and beyond which it should not be permitted to capitalize its mine slopes. Blockton Cahaba Coal Company was purchased by Little Cahaba in 1908. The slope of that mine is the No. 3 slope involved here. Defendant contends that this mine reached a productive

stage prior to its purchase by Little Cahaba. It was shown to have earned in 1910 $10,465.-15, and had a surplus at the end of the year, after paying $10,000 dividends, of $88,-660.31.

I am of opinion from all the evidence that these mines did reach a stage of production when the output of coal from them was such as to allow a profit on the money invested in them. The evidence shows that they were making a profit at the point where defendant ceased to allow the slopes to be capitalized, and, therefore, defendant was right in disallowing their further capitalization.

[3] Plaintiffs contend they should be allowed to capitalize the cost of their tenant houses as follows:

Little Cahaba ............................. $205,240 88
Blockton Cahaba .......................... 78,400 00

To support these values they introduced in evidence a so-called retrospective appraisal by one Cowin, a mining engineer, as well as the oral testimony of Mr. Cowin and other witnesses.

Defendant allowed capitalization of the houses as follows:

Little Cahaba ................................ $90,864 53
Blockton Cahaba ........................... 34,693 74

These figures represent the actual cost of the buildings to plaintiffs as shown by their books.

There might have been items charged to expense which should have been charged to the house accounts during the years prior to 1917, but no effort was made by the plaintiffs to segregate such items or show such cost. Their witness Lemon stated that such costs could be obtained from the taxpayers' records, but that it had not been done. The sole evidence as to such costs was the Cowin appraisal and oral testimony tending to support the costs given by Cowin in his appraisal. However, as a witness, Cowin admitted that all the items of the cost of the houses had not been taken from the taxpayers' records, but that from the books as well as other available facts his appraisal was the estimated average cost of the structures involved. So that I feel constrained to use the figures shown by the books and allowed by defendant.

Coming now to the last question as to whether plaintiffs are entitled to a profits tax exemption of 9 per cent., or only 7 per cent., I think it is unnecessary for me to determine this point, in view of my findings in the other two and main issues in this case.

Judgment will be entered in harmony with this opinion.