## LaBELLE IRON WORKS v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 453.   Argued January 6, 7, 1921.—Decided May 16, 1921.

1. The Act of October 3, 1917, c. 63, Tit. II, 40 Stat. 300, 302, in providing for a deduction of a percentage of "invested capital " before computation of the "excess profits " tax upon the income of a domestic corporation, does not mean to include in its definition of invested capital (§ 207) any marking up of the valuation of assets upon the corporate books to correspond with increase of market value or any paper transaction by which new shares are issued in exchange for old ones in the same corporation but which is not in substance and effect a new acquisition of capital property by it. Pp. 386, 389.

2. A corporation, having acquired ore lands for $190,000, proved, by extensive explorations and developments, that their actual cash value was over $10,105,400; thereupon, in 1912, it increased their book valuation by adding $10,000,000, as surplus, and, based thereon, declared a stock dividend for $9,915,400, which was carried out by surrender and cancellation of all the common stock, of like aggregate par value, and the issuance of one share each of preferred and new common stock for each share of the stock surrendered.   The increased value of the ore lands persisted when an excess profits tax was laid under the Act of 1917, *supra.   Held:* That such increase of value was not included in "invested capital " under § 207 (a) (3), as "paid in or earned surplus and undivided profits," (though an amount equal to the cost of the exploration and development might be), pp. 386, 390; nor under *id.* (2) as "the actual cash value of tangible property paid in other than cash, for the stock or shares" of the corporation.   Pp. 386, 390.

3. The Fifth Amendment having no "equal protection " clause, the

only rule of uniformity prescribed by the Constitution respecting duties, imposts and excises is the territorial uniformity required by Art. I, § 8. P. 391.

4. There were reasons, both theoretical and practical, including that of convenience in administration, for basing "invested capital" upon actual costs to the exclusion of higher estimated values; and resulting inequalities to corporations differently situated do not make out an arbitrary discrimination, amounting to confiscation and violating the due process clause of the Fifth Amendment. P. 392.

55 Ct. Clms. 462, affirmed.

APPEAL from a judgment of the Court of Claims disallowing a claim for a refund of money alleged to have been unlawfully exacted as an excess profits tax. The facts are stated in the opinion, *post*, 383.

*Mr. Charles McCamic* and *Mr. Charles E. Hughes*, with whom *Mr. Edward B. Burling* and *Mr. Jas. Morgan Clarke* were on the briefs, for appellant:

By the correct construction of the act the appellant is entitled to include as paid in or earned surplus and undivided profits, under § 207 (a) (3) of the act, the increase in the value of the ore lands due to the discovery of the ore bodies and to the natural increase in the market price of ore. The act contains no definition of the words "paid in or earned surplus and undivided profits."

Statutes imposing taxes are to be construed in favor of the taxpayer; the language employed is to be given its ordinary meaning; they are to be construed according to the spirit rather than the letter when the letter would make them palpably unjust; construed according to these rules the invested capital of appellant should include all its outstanding stock where that is represented by property of an actual cash value not less than the par value of the outstanding stock.

The ordinary meaning of the words "paid in or earned surplus and undivided profits," includes appreciation in

value. R. J. Bennett, Corporation Accounting, 1917, § 291, pp. 334, 336; Arthur Lowes Dickinson, Accounting Practice and Procedure, 1917, p. 62; Henry Rand Hatfield, Modern Accounting, 1916, p. 237; Harry C. Bentley, The Science of Accounts, 1913, § 36, p. 24; Leo Greendlinger, Financial and Business Statements (Alexander Hamilton Institute, 1917), vol. 22, pp. 195, 196; Year Book, 1911, p. 124.

Text writers on law and decided cases give the same definition of surplus and undivided profits as the accountants. Macben, Modern Law of Corporations, vol. II, pp. 1092, 1095; Morawetz, Private Corporations, 2d ed., vol. I, p. 412; Thompson, Corporations, 2d ed., § 5307; Cook, Corporations, 7th ed., vol. II, § 536; *Park* v. *Grant Locomotive Works*, 40 N. J. Eq. 114, 121.

The Department's definition, excluding appreciation from surplus, when analyzed closely, shows itself to be unsound; for it is admitted that when the property is sold the profit may become a part of surplus. But the sale does not create the profit. *Williams* v. *Western Union Telegraph Co.*, 93 N. Y. 162, 186, 191; *People* v. *Board of Commissioners*, 76 N. Y. 64, 74; *People* v. *Barker*, 165 N. Y. 305; *McGinnis* v. *O'Connor*, 72 Atl. Rep. 614; *Mangham* v. *State*, 11 Ga. App. 440; *Hutchinson* v. *Curtiss*, 92 N. Y. S. 70, 74; *Simcoke* v. *Sayre*, 148 Iowa, 132; *Anderson* v. *Farmers' Loan & Trust Co.*, 241 Fed. Rep. 322, 326; *Roberts* v. *Roberts-Wicks Co.*, 184 N. Y. 257; *Hubbard* v. *Weare*, 79 Iowa, 678; *Miller* v. *Bradish*, 69 Iowa, 278; *Equitable Life Assurance Society* v. *Union Pacific R. R. Co.*, 212 N. Y. 360.

The word "earned" does not limit the surplus which is to be included in invested capital. The statute merely contrasts "earned" with "paid in" surplus. The phrase in the act is "paid in or earned surplus and undivided profits." The meaning of "earned" is not the same as "realized." It includes in meaning "to acquire the

benefit of although not realized." *Stevens* v. *United States Steel Corporation*, 68 N. J. Eq. 373, 380; *Lewis's Estate*, 156 Pa. St. 337; *Nuding* v. *Urich*, 169 Pa. St. 289.

Our contention on this subject is that if the appreciation is surplus at all it is necessarily "paid in or earned" surplus. The word "earned" was probably used in contrast to "paid in " in the clause "paid in or earned surplus and undivided profits," and was perhaps intended to emphasize the thought that the surplus must be real and not fictitious.

If it be admitted that appreciation after realization is earned surplus, then it must be admitted that appreciation is earned surplus before the property is sold. The sale does not create the earning; it is the gradual increase in value which is the earning.

But if the word "earned" has any such narrow meaning as is contended for, that narrow meaning is not applicable to appellant in view of the facts admitted by the demurrer. The petition alleges that after the acquisition of the ore properties, extensive exploration and development work was carried on, and that by 1912, and at all times thereafter to 1917, the actual cash value of the ore lands was not less than $10,105,400.

New capital stock of the company was issued because the value of the ores justified it and this was a realization of the increased values.

This court in construing the 1909 corporation excise tax law, and the 1913 income tax law, held that appreciation accruing before the incidence of the tax was capital. The word "capital" as used in these cases must include "surplus." *Hays* v. *Gauley Mountain Coal Co.*, 247 U. S. 189; *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, 187; *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, 335; *Towne* v. *Eisner*, 245 U. S. 418; *Lynch* v. *Turrish*, 247 U. S. 221; *Lynch* v. *Hornby*, 247 U. S 339.

The construction here intended for will impose no

heavier burden on the Department than the construction of the Government.

The stock of the company, issued in 1912, was fully paid for, either by the tangible assets including the ore lands at their increased value, or the certificates of the old common stock. In either case tangible property was paid in for shares with an actual cash value within § 207 (a) (2) equal to $19,830,800,—and the company is accordingly entitled to include the full amount in its invested capital. *Williams* v. *Western Union Telegraph Co.*, 93 N. Y. 162, 190. In its essence the transaction in 1912 amounted to this: The shareholders surrendered all their old shares and thereupon, being in effect the owners of all the assets, "paid in" those assets to the corporation in exchange for the new stock issue.

The construction placed upon the act by the Department would create a wholly baseless and arbitrary discrimination amounting to a deprivation of property without due process of law. Such a construction is to be avoided if the act is to be constitutional.

This court has said that if there were arbitrary confiscation in a taxing law of Congress there would be a want of due process. *Knowlton* v. *Moore*, 178 U. S. 41, 77; *Brushaber* v. *Union Pacific R. R. Co.*, 240 U. S. 1, 24, 25. See also, *Wagner* v. *Baltimore*, 239 U. S. 207; *Twining* v. *New Jersey*, 211 U. S. 78; *McCray* v. *United States*, 195 U. S. 27; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107; *Billings* v. *United States*, 232 U. S. 261. The foregoing cases make it clear that a taxing law which imposes a tax based on a wholly arbitrary classification is void within the Fifth Amendment. To be sure, in all the cases the court found that the classification was not of that character. But the discussion in all is based on the implied assumption that if the classification were of that arbitrary character the law would be invalid.

The due process clause in the Fifth Amendment means

the same thing as the due process clause in the Fourteenth Amendment. *Carroll* v. *Greenwich Insurance Co.*, 199 U. S. 401, 410; *Tonawanda* v. *Lyon*, 181 U. S. 389, 392, 393; *French* v. *Barber Asphalt Paving Co.*, 181 U. S. 324; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107; *Hibben* v. *Smith*, 191 U. S. 310, 325, 326.

In *Gast Realty Co.* v. *Schneider Granite Co.*, 240 U. S. 55, and in other cases in this court, tax laws of States have been held so arbitrary and baseless as to violate the Fourteenth Amendment. *Looney* v. *Crane Co.*, 245 U. S. 178; *International Paper Co.* v. *Massachusetts*, 246 U. S. 135; *Southern Ry. Co.* v. *Greene*, 216 U. S. 400.

The present law as construed by the Department is utterly arbitrary, and therefore invalid, because the tax depends largely upon the cost of the taxpayer's property so that two taxpayers who have the same income, and property of equal value, will pay wholly different taxes if the cost of the property is different.

*The Solicitor General* for the United States.

*Mr. Frank Hagerman* and *Mr. Massey Holmes*, by leave of court, filed a brief as *amici curiæ*.

*Mr. Jesse Andrews*, by leave of court, filed a brief as *amicus curiæ*.

*Mr. William D. Guthrie*, *Mr. Henry M. Ward*, *Mr. Henry F. Parmelee* and *Mr. Langdon P. Marvin*, by leave of court, filed a brief as *amici curiae*.

*Mr. Clark J. Milliron*, *Mr. James M. Proctor* and *Mr. Edward S. Brashears*, by leave of court, filed a brief as *amici curiæ*.

*Mr. Clarence N. Goodwin*, by leave of court, filed a brief as *amicus curiæ*.

*Mr. Armwell L. Cooper, Mr. Ellison A. Neel* and *Mr. John S. Wright,* by leave of court, filed a brief as *amici curiæ.*

Mr. Justice Pitney delivered the opinion of the court.

The Court of Claims dismissed appellant's petition which claimed a refund of $1,081,184.61, alleged to have been erroneously assessed and exacted as an "excess profits tax" under Title II of the Revenue Act of 1917 (Act of October 3, 1917, c. 63, 40 Stat. 300, 302, *et seq.*). The case involves the construction and application of those provisions by which the deduction from income, for the purposes of the tax, is measured by the "invested capital" of the taxpayer; and a question is raised as to the constitutionality of the act as construed and applied.

Title I of the act imposed "War Income Taxes " upon individuals and corporations in addition to those imposed by Act of September 8, 1916, c. 463, 39 Stat. 756. Title II provided for the levying of "War Excess Profits Taxes" upon corporations, partnerships, and individuals. As applied to domestic corporations, the scheme of this Title was that, after providing for a deduction from income (§ 203, p. 304) equal to the same percentage of the invested capital for the taxable year which the average amount of the annual net income of the trade or business during the prewar period (the years 1911, 1912, and 1913) was of the invested capital for that period, but not less than 7 nor more than 9 per cent., plus $3,000, it imposed (§ 201, p. 303), in addition to other taxes, a graduated tax upon the net income beyond the deduction, commencing with 20 per centum of such net income above the deduction but not above 15 per centum of the invested capital for the taxable year, and running as high as 60 per centum of the net income in excess of 33 per centum of such capital. It applied to "all trades or businesses," with exceptions not now material (p. 303).

What should be deemed "invested capital." was defined by § 207 (p. 306), which, so far as pertinent, is set forth in the margin.[1]

The case was decided upon a demurrer to the petition, in which the facts were stated as follows: Appellant is a domestic corporation and, prior to the year 1904, acquired ore lands for which it paid the sum of $190,000. Between that time and the year 1912 extensive explorations and developments were carried on (the cost of, which is not stated), and it was proved that the lands contained large bodies of ore and had an actual cash value

---

[1] Sec. 207. That as used in this title, the term "invested capital" for any year means the average invested capital for the year, as defined and limited in this title, averaged monthly.

As used in this title "invested capital" does not include stocks, bonds (other than obligations of the United States), or other assets, the income from which is not subject to the tax imposed by this title, nor money or other property borrowed, and means, subject to the above limitations:

(a) In the case of a corporation or partnership: (1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor), and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year: *Provided*, That (a) the actual cash value of patents and copyrights paid in for stock or shares in such corporation or partnership, at the time of such payment, shall be included as invested capital, but not to exceed the par value of such stock or shares at the time of such payment, and (b) the good will, trade-marks, trade brands, the franchise of a corporation or partnership, or other intangible property, shall be included as invested capital if the corporation or partnership made payment bona fide therefor specifically as such in cash or tangible property, the value of such good will, trade-mark, trade brand, franchise, or intangible property, not to exceed the actual cash or actual cash value of the tangible property paid therefor at the time of such payment; but good

not less than $10,105,400; and at all times during the years 1912 to 1917, inclusive, their actual cash value was not less than the sum last mentioned. In the year 1912 the company increased the valuation of said lands upon its books by adding thereto the sum of $10,000,000, which it carried to surplus, and thereupon, in the same year, declared a stock dividend in the sum of $9,915,400, representing the increase in value of the ore lands. Theretofore appellant's capital stock had consisted of shares issued, all of one class, having a par value of $9,915,400. The declaration of the stock dividend was carried out by the surrender to the company of all the outstanding stock, and its cancellation, and the exchange of one share of new common and one share of new preferred stock for each share of the original stock.

In returning its annual net income for the year 1917 the company stated its invested capital to be $26,322,904.14, in which was included the sum of $10,105,400 as representing the value of its ore lands. The Commissioner of Internal Revenue caused a reassessment to be made, based upon a reduction of the invested capital to $16,407,507.14; the difference ($9,915,400) being the increase in the value of the ore lands already mentioned. The result was an additional tax of $1,081,184.61, which, having been paid, was made the subject of a claim for refund; and this having been considered and rejected by

---

will, trade-marks, trade brands, franchise of a corporation or partnership, or other intangible property, bona fide purchased, prior to March third, nineteen hundred and seventeen, for and with interests or shares in a partnership or for and with shares in the capital stock of a corporation (issued prior to March third, nineteen hundred and seventeen), in an amount not to exceed, on March third, nineteen hundred and seventeen, twenty per centum of the total interests or shares in the partnership or of the total shares of the capital stock of the corporation, shall be included in invested capital at a value not to exceed the actual cash value at the time of such purchase, and in case of issue of stock therefor not to exceed the par value of such stock; . . . .

the Commissioner, there followed a suit in the Court of Claims, with the result already mentioned.

Appellant's contentions, in brief, are, first, that the increased value of the ore lands, placed upon the company's books in 1912, ought to be included in invested capital under § 207 (a) (3), as "paid in or earned surplus and undivided profits." Second, that within the meaning of clause (2), which provides that invested capital shall include "the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation," the stock of the company issued in 1912, consisting of $9,915,400 of preferred stock and an equal amount of common, was fully paid for: either (a) by the tangible assets, including the ore properties at their increased value, or (b) by the surrender of all the certificates representing the old common stock, which, it is said, had an actual cash value equal to double its par. And, third, that the construction put upon the act by the Treasury Department, based, as it is said, not upon value but upon the single feature of cost, disregarding the time of acquisition, would render the act unconstitutional as a deprivation of property without due process under the Fifth Amendment, because so arbitrary as to amount in effect to confiscation; and hence that this construction must be avoided.

Reading the entire language of § 207 in the light of the circumstances that surrounded the passage of the act, we think its meaning as to "invested capital" is entirely clear. The great war in Europe had been in progress since the year 1914, and the manufacture and export of war supplies and other material for the belligerent powers had stimulated many lines of trade and business in this country, resulting in large profits as compared with the period before the war, and as compared with ordinary returns upon the capital embarked. The United States had become directly involved in the conflict in the Spring

of 1917, necessitating heavy increases in taxation; at the same time manufactures and trade of every description were rendered even more active, and in certain lines more profitable, than before, so that the unusual gains derived therefrom formed a natural subject for special taxation.

On the eve of our entry, and, in order to provide a "Special Preparedness Fund" for army, navy, and fortification purposes, an act (March 3, 1917, c. 159, 39 Stat. 1000) was passed, which, in Title II, provided for an excess profits tax on corporations and partnerships equal to 8 per centum of the amount by which their net income exceeded $5,000 plus 8 per centum of the "actual capital invested"; and, in § 202 (p. 1001), defined this term to mean "(1) actual cash paid in, (2) the actual cash value, at the time of payment, of assets other than cash paid in, and (3) paid in or earned surplus and undivided profits used or employed in the business," but not to include money or other property borrowed.

The Revenue Act of October 3, 1917, passed after we had become engaged in the war, took the place of the Act of March 3, and embodied a "War Excess Profits Tax," with higher percentages imposed upon the income in excess of deductions and a more particular definition of terms. A scrutiny of the particular provisions of § 207 shows that it was the dominant purpose of Congress to place the peculiar burden of this tax upon the income of trades and businesses exceeding what was deemed a normally reasonable return upon the capital actually embarked. But if such capital were to be computed according to appreciated market values based upon the estimates of interested parties (on whose returns perforce the Government must in great part rely), exaggerations would be at a premium, corrections difficult, and the tax easily evaded. Section 207 shows that Congress was fully alive to this and designedly adopted a term— "invested capital"—and a definition of it, that would

measurably guard against inflated valuations. The word "invested" in itself imports a restrictive qualification. When speaking of the capital of a business corporation or partnership, such as the act deals with, "to invest" imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains. See Webster's New Internat. Dict., "invest," 8; Century Dict., "invest," 7; Standard Dict., "invest," 1.

In order to adhere to this restricted meaning and avoid exaggerated valuations, the draftsman of the act resorted to the test of including nothing but money, or money's worth, actually contributed or converted in exchange for shares of the capital stock, or actually acquired through the business activities of the corporation or partnership (involving again a conversion) and coming in *ab extra*, by way of increase over the original capital stock. How consistently this was carried out becomes evident as the section is examined in detail. Cash paid in, and tangible property paid in other than cash, are confined to such as were contributed for stock or shares in the corporation or partnership; and the property is to be taken at its actual cash value "at the time of such payment"— distinctly negativing any allowance for appreciation in value. There is but a single exception: tangible property paid in prior to January 1, 1914, may be taken at its actual cash value on that date, but in no case exceeding the par value of the original stock or shares specifically issued for it; a restriction in itself requiring the valuation to be taken as of a date prior to the war period, and in no case to exceed the stock valuation placed upon it at the

time it was contributed. The provision of clause (3) that includes "paid in or earned surplus and undivided profits used or employed in the business " recognizes that in some cases contributions are received from stockholders in money or its equivalent for the specific purpose of creating an actual excess capital over and above the par value of the stock; and, in view of the context, surplus "earned" as well as that "paid in" excludes the idea of capitalizing (for the purposes of this tax) a mere appreciation of values over cost.

The same controlling thought is carried into the proviso, which relates to the valuation of patents, copyrights, trade-marks, good will, franchises, and similar intangible property. Every line shows evidence of a legislative purpose to confine the account to such items as were paid in for stock or shares, and to their values "at the time of such payment"; but, with regard to those *bona fide* purchased prior to March 3, 1917, there is a special provision, limiting the effect of any adjustments that might have been made in view of the provisions of the act of that date.

It is clear that clauses (1) and (2) refer to actual contributions of cash or of tangible property at its cash value contributed in exchange for stock or shares specifically issued for it; and that neither these clauses, nor clause (3) which relates to surplus, can be construed as including within the definition of invested capital any marking up of the valuation of assets upon the books to correspond with increase in market value, or any paper transaction by which new shares are issued in exchange for old ones in the same corporation, but which is not in substance and effect a new acquisition of capital property by the company.

It is clear enough that Congress adopted the basis of "invested capital" measured according to actual contributions made for stock or shares and actual accessions

in the way of surplus, valuing them according to actual and *bona fide* transactions and by valuations obtaining at the time of acquisition, not only in order to confine the capital, the income from which was to be in part exempted from the burden of this special tax, to something approximately representative of the risks accepted by the investors in embarking their means in the enterprise, but also in order to adopt tests that would enable returns to be more easily checked by examination of records, and make them less liable to inflation than if a more liberal meaning of "capital and surplus" had been adopted; thus avoiding the necessity of employing a special corps of valuation experts to grapple with the many difficult problems that would have ensued had general market values been adopted as the criteria.

In view of the special language employed in § 207, obviously for the purpose of avoiding appreciated valuations of assets over and above cost, the argument that such value is as real as cost value, and that in the terminology of corporation and partnership accounting "capital and surplus" means merely the excess of all assets at actual values over outstanding liabilities, and "surplus" means the intrinsic value of all assets over and above outstanding liabilities plus par of the stock, is beside the mark. Nor has the distinction between capital and income, discussed in *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, 187; *Hays* v. *Gauley Mountain Coal Co.*, 247 U. S. 189, 193; and *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, 334–335, any proper bearing upon the questions here presented.

Upon the strength of an administrative interpretation contained in a Treasury Regulation pertaining to the Revenue Act of 1917, under which "stocks" were to be regarded as tangible property when paid in for stock or shares of a corporation, it is insisted that appellant's stock dividend distribution of 1912 ought to be treated

as paid for in tangible property, the old stock surrendered being regarded as tangible for the purpose. But that distribution, in substance and effect, was an internal transaction, in which the company received nothing from the stockholders any more than they received anything from it (see *Eisner* v. *Macomber*, 252 U. S. 189, 210–211); and the old shares cannot be regarded as having been "paid in for" the new ones within the meaning of § 207 (a) (2), even were they "stocks" within the meaning of that Regulation, which is doubtful.

It is said that the admitted increase in the value of appellant's ore lands is properly to be characterized as earned surplus, because it was the result of extensive exploration and development work. We assume that a proper sum, not exceeding the cost of the work, might have been added to earned surplus on that account; but none such was stated in appellant's petition, nor, so far as appears, in its return of income. In the absence of such a showing it was not improper to attribute the entire $9,915,400, added to the book value of the ore property in the year 1912, to a mere appreciation in the value of the property; in short, to what is commonly known as the "unearned increment," not properly "earned surplus" within the meaning of the statute.

The foregoing considerations dispose of the contention that either the increased value of appellant's ore lands, or the surrender of the old stock in exchange for the new issues based upon that value, can be regarded as "tangible property paid in other than cash, for stock or shares in such corporation" within the meaning of § 207 (a) (2); and of the further contention that such increased value can properly be regarded as "paid in or earned surplus and undivided profits" under § 207 (a) (3).

It is urged that this construction, defining invested capital according to the original cost of the property instead of its present value, has the effect of rendering the

act "glaringly unequal" and of doubtful constitutionality; the insistence being that, so construed, it operates to produce baseless and arbitrary discriminations, to the extent of rendering the tax invalid under the due process of law clause of the Fifth Amendment. Reference is made to cases decided under the equal protection clause of the Fourteenth Amendment (*Southern Ry. Co.* v. *Greene,* 216 U. S. 400, 418; *Gast Realty Co.* v. *Schneider Granite Co.,* 240 U. S. 55); but clearly they are not in point. The Fifth Amendment has no equal protection clause; and the only rule of uniformity prescribed with respect to duties, imposts, and excises laid by Congress is the territorial uniformity required by Art. I, § 8. *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 557; *Knowlton* v. *Moore,* 178 U. S. 41, 98, 106; *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 150; *Billings* v. *United States,* 232 U. S. 261, 282; *Brushaber* v. *Union Pacific R. R. Co.,* 240 U. S. 1, 24. That the statute under consideration operates with territorial uniformity is obvious and not questioned.

Appellant cites *Looney* v. *Crane Co.,* 245 U. S. 178, 188, and *International Paper Co.* v. *Massachusetts,* 246 U. S. 135, 145, but these cases also are inapplicable, being based upon the due process clause of the Fourteenth Amendment, with which state taxing laws were held in conflict because they had the effect of imposing taxes on the property of foreign corporations located and used beyond the jurisdiction of the taxing State. There is no such infirmity here.

Nor can we regard the act—in basing "invested capital" upon actual costs to the exclusion of higher estimated values—as productive of arbitrary discriminations raising a doubt about its constitutionality under the due process clause of the Fifth Amendment. The difficulty of adjusting any system of taxation so as to render it precisely equal in its bearing is proverbial, and such nicety is not even required of the States under the equal protection

clause, much less of Congress under the more general requirement of due process of law in taxation. Of course it will be understood that Congress has very ample authority to adjust its income taxes according to its discretion, within the bounds of geographical uniformity. Courts have no authority to pass upon the propriety of its measures; and we deal with the present criticism only for the purpose of refuting the contention, strongly urged, that the tax is so wholly arbitrary as to amount to confiscation.

The act treats all corporations and partnerships alike, so far as they are similarly circumstanced. As to one and all, Congress adjusted this tax, generally speaking, on the basis of excluding from its operation income to the extent of a specified percentage (7 to 9 per cent.) of the capital employed, but upon condition that such capital be valued according to what actually was embarked at the outset or added thereafter, disregarding any appreciation in values. If in its application the tax in particular instances may seem to bear upon one corporation more than upon another, this is due to differences in their circumstances, not to any uncertainty or want of generality in the tests applied.

Minor distinctions—such as those turning upon the particular dates of January 1, 1914, and March 3, 1917— are easily explained, as we have seen. The principal line of demarcation—that based upon actual costs, excluding estimated appreciation—finds reasonable support upon grounds of both theory and practice, in addition to the important consideration of convenience in administration, already adverted to. There is a logical incongruity in entering upon the books of a corporation as the capital value of property acquired for permanent employment in its business and still retained for that purpose, a sum corresponding not to its cost but to what probably might be realized by sale in the market. It is not merely that

the market value has not been realized or tested by sale made, but that sale cannot be made without abandoning the very purpose for which the property is held, involving a withdrawal from business so far as that particular property is concerned. Whether in a given case property should be carried in the capital account at market value rather than at cost may be a matter of judgment, depending upon special circumstances and the local law. But certainly Congress, in seeking a general rule, reasonably might adopt the cost basis, resting upon experience rather than anticipation.

In organizing corporations, it is not unusual to issue different classes of securities, with various priorities as between themselves, to represent different kinds of contribution to capital. In exchange for cash, bonds may be issued; for fixed properties, like plant and equipment, preferred stock may be given; while more speculative values, like good-will or patent rights, may be represented by common stock. In the present case, for instance, when appellant took the estimated increase in value of its ore lands as a basis for increased capitalization, it issued preferred stock to the amount of the former total, carrying those lands at cost, and issued a like amount of common stock to represent the appreciation in their market value. It does not appear that in form the new issues were thus allocated; but at least there was a recognition of a higher claim in favor of one part of the book capital than of the other. Upon like grounds, it was not unreasonable for Congress, in adjusting the "excess profits tax," to accord preferential treatment to capital representing actual investments, as compared with capital representing higher valuations based upon estimates, however confident and reliable, of what probably could be realized were the property sold instead of retained.

From every point of view, the tax in question must be sustained. We intimate no opinion upon the effect of.

the act with respect to deductions from cost values of capital assets because of depreciation or the like; no question of that kind being here involved.

*Judgment affirmed.*

MR. JUSTICE McREYNOLDS concurs in the result.