TALL TIMBER LUMBER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6137.   Promulgated April 30, 1929.

*Ferdinand Tannenbaum, Esq.*, for the petitioner.
*Paul L. Peyton, Esq.*, for the respondent.

OPINION.

LITTLETON: The issue is as to the amount of the petitioner's invested capital for the year 1919. So far as the record discloses, the parties are in accord thereon except as to paid-in surplus. The petitioner contends that it is entitled to have this item of its invested capital increased by the amount of $710,000, this being the difference between the amount paid by the petitioner for the timber properties and what the petitioner claims was its actual cash value at date of purchase. That is, the petitioner contends that it is entitled to a paid-in surplus on account of the acquisition by it of certain timber lands in the manner set forth in our findings. The applicable provisions of the statute are section 326 (a) (1), (2), and (3) of the Revenue Act of 1918, which read as follows:

(a) That as used in this title the term "invested capital" for any year means (except as provided in subdivisions (b) and (c) of this section):

(1) Actual cash bona fide paid in for stock or shares;

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: *Provided,* That the Commissioner shall keep a record of all cases in which tangible property is included in invested capital at a value in excess of the stock or shares issued therefor, containing the name and address of each taxpayer, the business in which engaged, the amount of invested capital and net income shown by the return, the value of the tangible property at the time paid in, the par value of the stock or shares specifically issued therefor, and the amount included under this paragraph as paid-in surplus. The Commissioner shall furnish a copy of such record and other detailed information with respect to such cases when required by resolution of either House of Congress, without regard to the restrictions contained in section 257;

(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year.

Conceding for the purpose of this part of the discussion that the evidence establishes a cash value for the assets which were paid in in excess of the cash consideration given therefor, is the petitioner entitled to a paid-in surplus? Certainly not under subdivision (2) above, since the assets here in question were not paid in for stock.

The assets were acquired by petitioner for cash and then cash or other assets were paid by the stockholders for the stock. Nor do we think that the petitioner comes within subdivision (3), which provides for a "paid-in * * * surplus" without the qualifications contained in subdivision (2). For a corporation to be entitled to invested capital there must be, as was stated in *La Belle Iron Works* v. *United States*, 256 U. S. 377, an investment "either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business or by the concern itself in acquiring something of permanent use in the business." In this instance the investment which we are asked to recognize is not an investment by the individual, Charles L. Pack, for the reason that the assets transferred were not his property, but that of the River Land & Lumber Co., which did not become a stockholder in the petitioner. What Pack put into the business was cash for which stock was issued to him. And, further, Pack did not become the sole or even the majority stockholder in the petitioner, but only acquired a minority interest therein. The statement often repeated in petitioner's brief, to the effect that the timber lands were transferred to the petitioner in exchange for the cash consideration named in the purchase or sales agreement and the issuance of 45 per cent of its stock to Pack, is both misleading and contrary to the actual facts. No stock was issued for the property with which we are here concerned, but the stock was subscribed for and apparently paid for in cash. What petitioner seeks to capitalize is the value which may have attached to an agreement between Pack and the Buchanans under which Pack was allowed to subscribe for stock at par, instead of being required to pay a greater price for the stock, but this was not a paying in by an individual of the timber lands; these properties were paid in by the River Land & Lumber Co., and only their cost to the petitioner, as to which there is no controversy, may be included in petitioner's invested capital.

But even if it should be said that we are wrong in denying to petitioner the benefit of a paid-in surplus because the property was paid in by a corporation which did not become a stockholder in the petitioner, rather than by the sole stockholder of the paying-in corporation, who purchased stock for cash in the petitioner, we are still of the opinion that the evidence does not justify the allowance of the petitioner's contention. When the agreement of November 1, 1912, for the acquisition of the property in question was decided upon, the consideration named was $1,350,000, which was likewise the amount set out in the written contract which was executed by the River Land & Lumber Co. on December 19, 1912, and by the petitioner on February 3, 1913, and which sets out in detail the manner in which pay-

ments shall be made. When payments were finally completed, the deed to the property was executed on May 20, 1919, and such deed recites that the consideration for the property was $1,750,000 and acknowledges receipt of the same. The evidence is far from satisfactory as to why the price for the timber lands was increased by $400,000 and when this occurred, though there is no dispute that the price paid was $1,750,000 instead of $1,350,000, and the former amount was recognized by the Commissioner for invested capital purposes. Pack testified that he thought $450,000 ($50,000 specified in the contract and an additional $400,000) was paid at the time the contract was entered into, though this appears improbable in view of the carefully prepared written contract which was executed at that time and which sets out that only $50,000 in cash was to be paid and the remaining $1,300,000 was to be paid between that time and 1919. The more reasonable view of the entire transaction would seem to be that at some time between the execution of the contract and the delivery of the deed, the River Land & Lumber Co. was paid $400,000 more for the property than had originally been agreed upon. To what extent this additional consideration made up for the greater value of the property which the parties may have recognized when the sale was agreed upon, we do not know, for the reason that the evidence is not conclusive as to the cash value of the property at such time.

The evidence as to cash value was furnished by three witnesses. First, Charles L. Pack, who qualified as an expert on timber properties, testified that he considered the timber was worth $6 a thousand in December, 1912, and that the other parties likewise recognized that this was the approximate value per thousand, but it does not appear what quantity of the timber—how many thousand feet—was considered by the parties as having a value of $6 a thousand. There is nothing to indicate that a cruise had been made to determine the quantity of timber or that the parties in considering a value of $6 a thousand were likewise in accord, or even discussed the quantity of timber in the tract. The only testimony from this witness on quantity follows:

Q. Do you know about how much timber there was on that property?
A. About 400,000,000 feet.

But from this we can not say that he considered, at the date the sale in question took place, that there were approximately 400,000,000 feet of timber on these lands which was worth $6 a thousand, which would show a value of $2,400,000, nor can we say that, when the Buchanans were inclined to agree that the timber was worth $6 a thousand, they were likewise agreed as to the quantity of the timber and the value of the entire tract. It is true that the Commissioner,

in 1924, determined that the quantity of timber on these lands as of March 1, 1913, was approximately 400,000,000 feet, but from this it would not necessarily follow that any one knew in 1912 the quantity of timber in question, or that the quantity as determined by the Commissioner was a quantity to which the unit price of $6 a thousand would be applicable. The latter consideration is important, for the reason that cruises of timber are made on various bases. That is, a cruise may be made of all timber 12 inches in diameter and upwards, or it may be some greater diameter used as a minimum. Obviously, different quantities will result, depending on the basis of the cruise and likewise a different price may be paid per thousand, depending upon how closely the timber is to be cut. Here what we are interested in is the actual cash value of the timber tract for the purpose of the sale in question, and we do not think this is shown by the unit price per thousand of timber, without more definite information as to the quantity to which this would be applicable. What this witness asks us to accept is that while the parties agreed to a price of $1,350,000 for the property sold, it had an actual cash value of almost twice this amount, and we do not think his testimony supports this conclusion.

The testimony of the next witness, Thomas, is to the effect that the unit price of the timber in 1912 was $6 a thousand, and that the estimated quantity was 399,581,000 feet, which is the exact footage determined by the Commissioner as of March 1, 1913. When we consider that we are here concerned with a tract of 30,000 acres and that a quantity determination of such an acreage is largely a matter of estimate on which no two persons would likely agree as to the exact footage, we think it fair to say that his determination of the cash value of the tract is little more than a substitution of his unit price for that of the Commissioner, without an independent determination as to the quantity in question. The last witness who testified as to value stated that he was not familiar with this property in 1912, but had since become familiar with it. He made the following answers to certain questions on cross-examination:

Q. How do you know there is four million feet there?
A. I had some knowledge of the timber before it was cut, and then information I had gotten from the Lumber Company.
Q. You mean to say some one has told you how much timber there was there?
A. Yes, sir.

Obviously, such testimony is not very helpful. It may be argued that what these witnesses were testifying to was a quantity which is admitted by the Commissioner, but it is not shown that these witnesses had any knowledge of the basis of the Commissioner's quantity determination, or the extent of utilization contemplated by the Com-

missioner's determination. It may well be that a unit price of $6 a thousand is proper, if applied to only certain sizes of trees, which would produce an entirely different result than if a smaller minimum size had been used, or if based upon a different degree of utilization. See *Boyne City Lumber Co.*, 7 B. T. A. 36. But we are unwilling to take the Commissioner's determination of the quantity of timber, made more than 10 years after the sale took place, and say that, because the parties to the transaction recognized the timber as worth $6 a thousand, they likewise were agreed as to the quantity to which this unit price would be applied in order to arrive at the cash value for the purpose of the sale when made. Even when we accept the evidence that the property was sold for less than its real value because of the advantage which would accrue to Pack through the right given him to subscribe for stock on the same basis as other stockholders, we must know the actual cash value of the property in order to see what he gave up for the consideration which he received in cash and stock. And even if it could be said that the parties were trading on the basis of 400,000,000 feet of timber at $6 a thousand, a part of which was to be paid in the cash consideration named in the contract and the balance through the payments which Pack might reasonably have expected to receive in the form of future dividends on the stock which he was allowed to purchase, this would not establish a cash value of $2,400,000, as contended by the petitioner, for the reason that the future dividend payments would have to be reduced to a present-worth basis as of 1912. Nor do we think it conclusive as to the actual cash value of the property when paid in that the Commissioner fixed its fair market value as of March 1, 1913, for depletion purposes at $2,258,657.08, since the Commissioner denied that the property had any greater value at the time paid in than $1,750,000, and the burden of proving its value is on the petitioner.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

---

GREEN, dissenting: I am convinced that the timber properties acquired by the petitioner had a value considerably in excess of the $1,750,000 paid therefor. The respondent has determined the value to be $2,258,657.08, as of March 1, 1913, and the purchase was made in 1912. His determination in this respect is presumptively correct. Regardless of whether the petitioner has proven, as of the date of the purchase, a value in excess of this amount, I feel that the evidence requires a finding of at least that value on the date of purchase. The remainder of this opinion proceeds upon the assumption that the excess value amounting to $508,657.08 has been established.

Invested capital is a statutory creation, the nature of which is at times so confusing that a Senator of the United States recently, while speaking to the Senate, compared the statute to "Alice's Adventures in Wonderland." The true intent and meaning of the statute can not always be determined by a rigid adherence to the literal wording thereof and recourse must be had to other sources from which the true intent of Congress may be ascertained. The solution of this problem must come from an application of the statute in its intended meaning to the facts which we have found. The applicable provisions of the statute are quoted in the prevailing opinion.

We are unable to find as a fact that the petitioner, in consideration of the conveyance to it of the timber properties, gave the River Land & Lumber Co. any of its stock or any right to subscribe thereto. So far as the record discloses, the only contract agreement or negotiation between the two corporations related to the sale of the timber for a consideration of $1,750,000. The old company received no stock in the new. It is easy to say that the various interested parties indulged in " short-cuts " and that the transaction is the same as if it had been carried out some other way. For example, Pack, as the sole stockholder, might have caused it to distribute to him, as a liquidation in kind, the timber properties which the petitioner acquired from the old corporation, or the consideration moving from the new to the old corporation might have been $1,750,000 plus the right to subscribe for 45 per cent of the stock, but the plain fact is that the new corporation bought the timber properties for cash from the old and, although the transaction was related to agreements between the stockholders of the new and the old corporations, it was a plain sale for cash.

But it seems to me that a conclusion that the timber properties were acquired for cash does not dispose of the question. Several things are apparent. It is clear that the value of the properties acquired exceeded their cost by at least $508,657.08. Also, it is apparent that the transaction was not carried out at arms' length. Further, and of much more importance, it is apparent that Pack, in addition to the amount paid for stock, has invested in and risked in the petitioner's business the sum of $508,657.08. A complete failure of the company would result in a loss by him of that amount in addition to his investment in the stock. This amount is his contribution to the capital of the petitioner corporation. Whether or not it may be said that he " paid in " this amount, it is clear that he *caused* it to be paid in to the petitioner. The amount is there; it is there as the result of Pack's control over it; the actual cash value of the petitioner's assets is increased by $508,657.08 as the result of his action,

and the assets of another corporation, of which he was the sole stockholder, are reduced by that amount.

The statute relating to invested capital and its computation is builded upon the thought of capital invested. It was intended that the excess-profits tax be measured in the light of the cash and/or value of assets which the corporate stockholders had risked in the business. The statute uses the phrase "bona fide paid in" for stock or shares in 326 (a) (1) and (2), and provides that a paid-in surplus may result. In (3) of paragraph (a) of the same section, it provides for the inclusion of "paid-in" surplus, without mention of the source from which or the method by which it was derived.

The question of whether, within the literal wording of section 326, this petitioner is entitled to have this amount included in its paid-in surplus, is fairly debatable, but, clearly, when the purpose and underlying thought of the statute are considered, the petitioner is entitled to include the amount as paid-in surplus.