*356 OPINION.
SteRNhagen :
The petitioner, having in 1914 acquired the mining properties in question, computed its invested capital for 1917 and 1918 under the war and excess-profits tax by including the full stipulated value of such properties at the date acquired. The statutory authority which it cites is Revenue Act of 1917, section 207 (a), and Revenue Act of 1918, section 326 (a), which provide that invested capital includes paid-in surplus, and that paid-in surplus may include the clear and substantial excess value of tangible property over the par value of shares for which it is issued. The respondent’s determination rests on the view that the properties were not acquired by petitioner for stock or shares and were not paid-in surplus, but were acquired by purchase for the assumption of the Connellsville Company’s liabilities.
If the petitioner purchased the properties, the cost is the measure of its investment, and it may not include in invested capital more than such cost irrespective of how much the value of the properties may exceed it. La Belle Iron Works v. United States, 256 U. S. 377, 389; Hotel Wisconsin Realty Co. v. Commissioner, 47 Fed. (2d) 842, affirming 16 B. T. A. 334; Keystone Wood Products Co., 19 B. T. A. 1116, 1122; Klamer-Goebel Furniture Co., 11 B. T. A. 1322, 1324. On the other hand, if the properties were paid in to petitioner expressly for its shares, the actual value of such properties when so paid in, even though exceeding the par value of the shares issued therefor, would measure the investment and thus be within the intendment and letter of the statute defining invested capital. Nansemond Brick Corporation, 8 B. T. A. 1117, 1119; Charles Rubens & Co., 6 B. T. A. 626; Henderson Overland Co., 4 B. T. A. 1088; Steinbach Co., 3 B. T. A. 348; Sphar Brick Co., 2 B. T. A. 946.
We may first clear away the suggestion that there was a paid-in surplus by way of gift from shareholders. Nothing in the evidence supports it. The plan of refinancing was based entirely on business necessity with all interests carefully guarded. What Whyel, Semans and Whyel gave up was paid for. They agreed with the Connells-ville Company to buy the assets for an amount equal to its liabilities. *357 In turn they assigned their contract to petitioner for the express consideration of the assumption of their obligations. There is in this neither direct evidence of a gift nor motive or other circumstance from which a gift could be inferred.
Both parties suggest, although with frank lack of conviction, the possibility that, because this was essentially merely an arrangement for new financing, it might be treated as a continuing ownership and that the earlier and later corporations might be regarded as identical. We reject this because the record clearly establishes the legal distinction between the two corporations and the contracts by which the transfer was accomplished.
We are of opinion that the contract was not acquired by petitioner under circumstances which indicate a paid-in surplus. It was, as shown by the express terms of the assignment of September 24 and by the surrounding circumstances, acquired, not as a gift or for shares of stock, but by purchase for the fixed amount of the liabilities assumed. All of the shares of stock were later subscribed for by various individuals for cash at par and were in due time paid for in cash at par. Whyel, Semans and Whyel, who were by no means the sole shareholders, paid for their shares in cash like all other subscribers and received only the number of shares to which their cash subscriptions entitled them. At that time, the petitioner had already become the owner of the contract rights under the option, and it could not have been deprived thereof nor’ compelled to issue shares therefor. When Whyel, Semans and Whyel assigned their contract on September 24 they were not making a contribution or investment as shareholders to their corporation, but, as individuals, were thereby disposing of their contractual obligations as well as their rights. The corporation was at the same time investing no more than its obligation to assume the liabilities of the Connells-ville Company. As said in Amalgamated Products Co., 12 B. T. A. 659, 666, “To hold that any contract made by a corporation through the efforts of a stockholder should be treated as paid in for capital stock would be a novel and startling proposition.”
In holding as we do that the contract does not represent paid-in surplus, we have found it essential only to say that the contract and circumstances in which it was acquired in September, 1914, established that it was not paid in for stock or shares or by way of gift from a shareholder. The statement appearing in the alleged copy of the minutes of October 12, 1914, that the assignment be accepted in part consideration for stock might be treated as a mere resolution which, as shown by the evidence, was not carried out. See A. Friederich & Sons Co., 2 B. T. A. 1318, 1322. But the circumstances which developed at the hearing in respect of this exhibit *358 require comment. The respondent, not questioning the genuineness of the copy, at first stipulated it to be correct and made no objection to its introduction in evidence. He later moved to strike the exhibit because it was not the best evidence, and because there was no foundation for the use of secondary evidence. He then introduced proof to show that it was inconsistent with the sworn statements and conduct of petitioner’s officers and representatives for many years, both in connection with official statements to the Commonwealth of Pennsylvania and to the bureau of internal revenue. Petitioner’s attorney then voluntarily testified that he had himself, together with the now deceased president of petitioner, in 1927, after this proceeding had been instituted, caused the original minutes to be removed from the minute book and destroyed, and had a copy made to replace the original. His explanation for doing this was that the original minutes had become mutilated and to some extent illegible. The copy which he said he had compared with the original carried on its face no statement that it was a copy and no lack of legibility, although it was plainly in different type from that of other minutes in the book.
Under such circumstances we can have no assurance of what the original minutes contain, and the secondary evidence should be disregarded. To permit a party to litigation to deliberately destroy evidence and then in his own behalf introduce a copy made by himself and his attorney would obviously subvert the basic principles of the best evidence rule and promote chicanery. If the original minutes were partially mutilated and their contents illegible, their effect was something to be determined by the Board from an examination of the original evidence; and petitioner had no right to rewrite the minutes in an attempt to make clear the portions which were doubtful.
We have been able to find no case like this in the books, but the unmistakable implications support the disregard of secondary evidence introduced by a party in his own behalf after he has voluntarily and deliberately destroyed the best evidence during the pendency of the controversy. The discretion of the court to receive such evidence when the original has been involuntarily or inadvertently destroyed if satisfied of its reliability can not reach the present situation.
In Riggs v. Tayloe, 9 Wheat. 487, the Supreme Court said:
It will be admitted that where a writing has been voluntarily destroyed, with an intent to produce a wrong or injury to the opposite party, or for fraudulent purposes, or to create an excuse for its non-production, in such cases, the secondary proof ought not to be received; but in cases where the destruction or loss (although voluntary) happens through mistake or accident, the party can not be charged with default.
*359 See also 9 Am. and Eng. Ann. Cases, page 4841 note; Wigmore on Evidence (2d Ed.) §1198; Jones on Evidence (3d Ed.) §217.
We hold that respondent correctly excluded from petitioner’s invested capital for 1917 or 1918 any amount in respect of the contract to purchase the Connellsville properties and any amount in respect of such properties themselves in excess of the purchase price thereof paid pursuant to this contract.
It follows also from what has been said that, since the depreciable and depletable properties were acquired by purchase after March 1, 1913, the basis for annual deductions in 1917 and 1918 (and 1919 for net loss purposes in 1918) for depreciation and depletion is the cost represented by the amount of liabilities assumed, with proper adjustments for subsequent depreciation, depletion and new acquisitions.
There is in the record, particularly in view of our holdings above, insufficient ground to modify the respondent’s determination of loss in 1919 to be used as a net loss in computing the deficiency for 1918.

Judgment will be entered imder Buie 50.