L. A. Dreyfus Company v. Commissioner.
L. A. Dreyfus Co. v. Commissioner
Docket No. 11883.
United States Tax Court
1949 Tax Ct. Memo LEXIS 38; 8 T.C.M. (CCH) 972; T.C.M. (RIA) 49266; October 31, 1949
*38 Harold R. Medina, Jr., Esq., for the petitioner. Thomas R. Charshee, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves a deficiency of $32,357.36 in excess profits tax for the taxable year ended December 31, 1941. By amendment to his answer respondent requested an increase in the deficiency in excess profits tax in the amount of $2,062.19. Petitioner does not contest the claim for the increase in deficiency, which is based upon a conceded error in computation and has no relation to the determination of the principal amount of the deficiency. The single issue presented for our determination is whether the amount of $850,000 included in an increase in the capitalization of the Dreyfus Company from $100,000 to $1,000,000, as of June 30, 1917, was based upon tangible property paid into the company and includible in its equity invested capital for excess profits purposes. Some of the facts were stipulated and are so found. The stipulation filed is incorporated herein by reference. Findings of Fact Petitioner, the L. A. Dreyfus Company, was incorporated under the laws of the State of New York on April 19, 1909, with *39 an authorized capital stock of $100,000, represented by 1,000 shares of $100 par value stock. All of the shares were issued to Dr. L. A. Dreyfus in 1909, 900 shares being issued for secret processes and formulae for the manufacture of a chewing gum base and 100 shares being issued for $10,000 in cash. The petitioner filed its income and excess profits tax returns for the taxable year ended December 31, 1941, with the collector of internal revenue for the first collection district of New York. In computing its excess profits tax for 1941, the petitioner used the excess profits credit based upon invested capital in accordance with the provisions of section 712 of the Internal Revenue Code. The secret processes and formulae transferred to the petitioner by Dreyfus in 1909 were invented by him for the manufacture of a chewing gum base called paloja as a substitute for chicle. After the formulae were transferred to the petitioner the chewing gum base made from them was sold to the Wm. Wrigley, Jr. Company. As the result of complaints by the Wrigley Company to the petitioner about defects in the gum base, development work on the formulae was continued and improvements *40 were made in them to achieve greater uniformity in product characteristics and to eliminate foreign matter. As developments were made Dreyfus reduced the formulae to writing in 1910, 1911 and 1912, but no recognition was made of them as new formulae and no change was made in petitioner's capital structure. Further improvements were made until 1916, when formulae for the manufacture of a product acceptable to the Wrigley Company were developed. The basic ingredients of the original formulae remained the same, but the use of additional ingredients and chemicals and processes so changed the formulae as to make them substantially new processes. Chewing gum base made from the new formulae was then sold to the Wrigley Company. In 1916, when the new formulae were developed, the Wrigley Company sent a representative to ascertain their nature and to assure their transfer to the petitioner. As president of the petitioner, Dreyfus revealed the exact nature of the new formulae to the Wrigley Company's representative and they were reduced to writing. The formulae were then placed in safe keeping to evidence that they were the property of the petitioner. When the Wrigley Company became satisfied *41 that the chewing gum base made from the new formulae was satisfactory to it, it began to purchase greater quantities of the petitioner's products. Petitioner's sales of chewing gum base to the Wrigley Company increased as follows: Year
Pounds
1915
844,751
1916
889,398
1917
1,736,051
1918
3,561,765
1919
4,728,532
In 1916, after concluding that the new formulae and processes were acceptable to it, the Wrigley Company purchased a controlling interest in the petitioner by purchasing 510 shares of stock from Dreyfus for $500,000. Immediately following that transaction the Wrigley Company owned 51 per cent of petitioner's stock and Dreyfus owned 49 per cent. On June 30, 1917, a special meeting of the petitioner's stockholders was held and the following resolution was adopted: "WHEREAS, The Stockholders, by unanimous consent, have agreed to an increase of capital stock of the Company from $100,000.00 to $1,000,000.00, "THEREFORE, Be it resolved that the President and Secretary be authorized to issue certificates for the said increase in stock; that the Treasurer make the necessary adjustments on the books providing for the additional capital necessary for *42 carrying on the business of the L. A. Dreyfus Company, and for the amount to be paid for new formulae and good will of the Company, and "WHEREAS, Dr. L. A. Dreyfus has perfected a new process for the manufacture of Chicle Substitute, and which is acquired by the L. A. Dreyfus Company for use in the manufacture of its products, "RESOLVED, That the sum of $450,000.00 be paid to said Dr. L. A. Dreyfus out of the funds of the Company, to be obtained by the sale of additional stock which will be issued by increase in capitalization, and the Officers be directed to issue stock for such amount to compensate the said Dr. L. A. Dreyfus therefor." On July 2, 1917, the 510 shares of stock held by the Wrigley Company and the 490 shares of stock held by Dreyfus were cancelled in exchange for the issue of 5,100 shares of new stock to the Wrigley Company and 4,900 shares to Dreyfus. On July 2, 1917, the increase in capital stock of the petitioner was carried into effect on petitioner's books by the following entry: "Secret processes and formula
Dr. $450,000
Good will
Dr. 400,000
L. A. Dreyfus, special loan
Dr. 50,000
Capital stock
Cr. 900,000
"Pursuant to an agreement *43 dated January -, 1917, which was entered into by all of the stockholders of record of the L. A. Dreyfus Co. as at this date, unanimous consent was given to increase the capital stock from $100,000 to $1,000,000 and the purpose of the foregoing entry is to carry this into effect." Petitioner never paid Dreyfus the $450,000 or any part of it authorized by the stockholders' resolution of June 30, 1917. No stock was issued to him other than the issue of 4,900 shares in exchange for the 490 shares of original stock which were surrendered and cancelled. Dreyfus was president and treasurer of the petitioner from 1909 until his death in 1920. He received no salary from the petitioner from 1909 through 1911, but received a salary from the petitioner for the years 1912 through 1915 of $10,000 per year and for the year 1916 of $10,833. In the petitioner's excess profits tax return for 1941 excess profits credit based upon invested capital was claimed. The petitioner included in its invested capital the amount of $850,000 set upon its books on July 2, 1917, for secret processes and formulae and good will. Respondent determined the deficiency here involved as the result of the reduction of *44 equity invested capital by the amount of $850,000. The increase in petitioner's capital stock did not represent an acquisition of capital property by the petitioner, but was issued to reflect an appreciation in value of petitioner's assets to the extent of $850,000. Neither Dreyfus nor the Wrigley Company paid in money or property to petitioner for the new stock issued to them at the rate of ten shares of new stock for each one share of old stock. Opinion LEMIRE, Judge: The question for our determination here is whether petitioner is entitled to include in its equity invested capital for excess profits tax credit purposes the amount of $850,000 allegedly paid in stock by the petitioner for formulae and secret processes and good will. There is no dispute as to the computation of the excess profits tax for 1941 but only as to the determination of the total amount of equity invested capital. Section 718(a)(2) of the Internal Revenue Code includes in the definition of equity invested capital "Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital". Petitioner contends *45 that Dreyfus invented a new process for the manufacture of chewing gum base in 1916, that he owned that process, and that he sold that process to the petitioner for stock. Although the petitioner devoted a substantial portion of its efforts, both at the hearing and on brief, to its first two contentions, we think that further consideration of those contentions is unnecessary, since, assuming that the 1916 formulae were entirely new, there is no evidence that Dreyfus alone invented them or that he ever actually owned them personally. We concern ourselves here only with the determination of the correctness of petitioner's contention that Dreyfus sold the 1916 formulae to the petitioner for stock in the amount of $850,000. The parties cited no authorities interpreting the application of section 718(a)(2) to our question here and we have been unable to find any. However, it appears that the definition of invested capital in section 207 of the War Excess Profits Tax Act of 1917 [1] is similar in all respects here material to the definition of equity invested capital contained in section 718, Internal Revenue Code. Liberty Mirror Works, 3 T.C. 1018; Home Guaranty Abstract Co., 8 T.C. 617. *46 In discussing the meaning of invested capital in section 207 of the act of 1917 in La Belle Iron Works v. United States, 256 U.S. 377, the Supreme Court said: "* * * The word 'invested' in itself imports a restrictive qualification. When speaking of the capital of a business corporation or partnership, such as the act deals with, 'to invest' imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains. See Webster's New Internat. *47 Dict. 'Invest,' 8; Century Dict. 'Invest,' 7; Standard Dict. 'Invest,' 1. "In order to adhere to this restricted meaning and avoid exaggerated valuations, the draftsman of the act resorted to the test of including nothing but money, or money's worth, actually contributed or converted in exchange for shares of the capital stock, or actually acquired through the business activities of the corporation or partnership (involving again a conversion) and coming in ab extra, by way of increase over the original capital stock. How consistently this was carried out becomes evident as the section is examined in detail. Cash paid in, and tangible property paid in other than cash, are confined to such as were contributed for stock or shares in the corporation or partnership; and the property is to be taken at its actual cash value 'at the time of such payment' - distinctly negativing any allowance for appreciation in value. * * *" It was manifestly the understanding of Congress in discussing the bill [2] which was incorporated in the Revenue Act of 1940 and the Internal Revenue Code as section 718(a) that one basis of equity invested capital is the price the stockholder pays for his stock. *48 American Business Credit Corporation, 9 T.C. 1111. That is, the term "invested capital" means an investment by a stockholder of money or money's worth in a corporation in exchange for stock in the corporation. It is clear that it has never been construed to include any marking up of the valuation of assets upon the books to correspond with increase in market value or any paper transaction by which new shares of stock are issued in exchange for old shares, in the same corporation, but which is not in substance and effect an acquisition of capital property by the corporation in exchange for stock. La Belle Iron Works v. United States, supra.
In this case the evidence is that the petitioner and Dreyfus, the principal officer and sole stockholder of petitioner, had worked for years to develop the formulae and processes employed by petitioner in the manufacture of chewing gum base so as to make that product acceptable to petitioner's principal customer, the *49 Wrigley Company. When the formulae and processes were improved to such an extent in 1916 that the petitioner's product became satisfactory to the Wrigley Company the Wrigley Company sent a representative to Dreyfus to ascertain the exact formulae being employed and that the petitioner had the rights to their use. Dreyfus revealed the formulae to the Wrigley Company's representative and satisfied him that the formulae were the property of petitioner. Having satisfied itself that the petitioner had the formulae, the Wrigley Company purchased from Dreyfus 51 per cent of the stock in petitioner, paying $500,000 therefor. Nothing was paid to the petitioner and the ownership of the formulae was not directly affected by the transfer of petitioner's stock from Dreyfus to the Wrigley Company. On June 30, 1917, the Wrigley Company. owning 51 per cent of petitioner's stock, and Dreyfus, owning 49 per cent of petitioner's stock, met in a special stockholders' meeting and agreed to increase the capital stock of petitioner from $100,000 to $1,000,000. Included in the $900,000 increase in capital stock were shares allegedly issued in the amount of $850,000 for intangibles, consisting of $450,000 *50 for secret processes and formulae and $400,000 for good will. The 490 shares of stock held by Dreyfus and the 510 shares held by the Wrigley Company were cancelled on July 2, 1917, and 10,000 new shares of stock were issued, 4,900 to Dreyfus and 5,100 to the Wrigley Company. Nothing was paid by either of the stockholders for the new stock issued to them and nothing to them and nothing was paid to Dreyfus for the formulae. He merely received an issue of new stock in exchange for his old stock. Immediately after the issue of new stock both Dreyfus and the Wrigley Company held stock in the petitioner exactly as before, having simply received certificates for ten shares of new stock for each one share of old stock they had held. No change in the capital structure of the petitioner was effected by this series of transactions. Although the stockholders resolved to pay Dreyfus for the formulae, nothing in fact was ever paid. The acceptability of the chewing gum base made from the formulae developed in 1916 to the Wrigley Company indicated that sales of the product would increase sharply and that the petitioner's business would appreciate considerably in value. The increase in petitioner's *51 capital stock and the exchange of new shares for old at ten for one merely reflected this appreciation of value. We have no doubt that the formulae developed in 1916, whether they be considered entirely new formulae or not, increased the value of petitioner's business greatly. However, we are unable to find on the evidence whether Dreyfus alone invented the 1916 formulae or whether he merely collaborated with petitioner's chemists in developing them. Nor can we find with any certainty from the evidence whether Dreyfus or the petitioner owned the formulae prior to the purchase of stock in the petitioner by the Wrigley Company. At that time the Wrigley Company satisfied itself that the petitioner owned the formulae, but there is no evidence as to when any transfer from Dreyfus to the petitioner was made, if any transfer was in fact made. Mere appreciation in value of assets already held by the petitioner does not constitute a new investment in the corporation. The marking up of the value of petitioner's assets was a mere paper transaction, not a real increase in the capital investment in the petitioner. The appreciated value of petitioner's corporate assets cannot be treated as part *52 of corporate surplus or profits or as contributions of capital for the purpose of increasing its equity invested capital. La Belle Iron Works v. United States, supra; Home Guaranty Abstract Co., supra. We conclude that petitioner received nothing for the new stock issued in 1917 and that intangibles set up on petitioner's books on July 2, 1917, in the amount of $850,000 are not includable in petitioner's equity invested capital under section 718(a)(2), Internal Revenue Code. Decision will be entered under Rule 50. Footnotes
1. (a) In the case of a corporation or partnership: (1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment * * * and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year: * * *↩
2. Hearings on H.R. 10,413, Senate Committee on Finance, 76th Cong., 3d sess., p. 198; Congressional Record, 76th Cong., 3d sess., p. 12,251; Joint Hearings on H.R. 10,413, 76th Cong., 3d sess., p. 149.↩