WESTERN INDIANA GRAVEL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 23855.   Promulgated February 29, 1932.

*C. G. Maxwell, Esq.,* for the petitioner.
*L. A. Luce, Esq.,* for the respondent.

656

**OPINION.**

MATTHEWS: This proceeding involves three principal questions: (1) whether the value of the four contracts executed on March 1, 1916, between the petitioner and the Railroad Company is includable in petitioner's invested capital; (2) whether a deduction may be allowed petitioner in respect of exhaustion of the same contracts; and (3) whether the petitioner's condition in 1920 and 1921 was such as to entitle it to special assessment under section 327. Certain secondary questions arise which can be disposed of in the consideration of the major issues.

As to the first question, invested capital, the controlling provisions of the 1918 and 1921 Revenue Acts (which in these respects are identical) are set out by footnote.[1]

---

[1] SEC. 325. (a) That as used in this title—

The term "intangible property" means patents, copyrights, secret processes and formulae, good will, trade-marks, trade-brands, franchises, and other like property;

The term "tangible property" means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property;

\* \* \* \* \* \* \*

SEC. 326. (a) That as used in this title the term "invested capital" for any year means (except as provided in subdivisions (b) and (c) of this section):

\* \* \* \* \* \* \*

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such

The statute requires that the property be "*bona fide* paid in for stock or shares," in order to be included in invested capital. The petitioner contends that this requirement is met by the transfer of the rights under the contracts by Neville and his associates in exchange for stock of the corporation under the corporate resolution of March 3, 1916; and that the rights had a value at that time equal to the par value of the stock issued therefor, or $100,000. On the evidence we are of the opinion that the associates held in their individual capacities no rights in these contracts which they could have transferred to the petitioner corporation on March 3, 1916. It is necessary here to call attention to but a few facts to sustain this conclusion.

The letter of January 10, 1916, in which Neville and his associates made the offer to the Railroad, is signed "Western Indiana Gravel Company, by M. A. Neville." The Railroad's letter of February 17, 1916, submitting the contracts to Neville and his associates, is addressed to the Western Indiana Gravel Company; and in all four contracts the second party is designated as "The Western Indiana Gravel Co., a corporation organized under the laws of the State of Indiana." That letter requested that the contracts be executed and returned to the Railroad, "for execution on the part of this company." It appears as a settled policy of the Railroad that it would sign a contract only after an agreement had been reached and the other party had already signed.

Neville, having seen the completed drafts of the contracts in the chief engineer's office, proceeded on February 18 to incorporate himself and his associates as the Western Indiana Gravel Company. The certificate of incorporation was issued by the State of Indiana on February 26. The execution of the contracts by the petitioner took place a few days later, on March 1.

We are unable to perceive, on this evidence, that any valid, legally binding contract between the five associates and the Railroad Company existed prior to the formal execution of the four contracts on March 1 by the petitioner corporation.

Summarized, the facts clearly show that the five associates, through Neville and Coppock, had reached a general understanding with

tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: * * *

* * * * * * *

(5) Intangible property bona fide paid in for stock or shares on or after March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year, whichever is lowest: *Provided,* That in no case shall the total amount included under paragraphs (4) and (5) exceed in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year; * * *

officials of the Railroad Company, in particular Worcester and Paquette, with respect to the two gravel beds; that this understanding finally crystallized into a definite written offer by Neville in the name of the Western Indiana Gravel Company; that this offer was considered and modified in some respects by the Railroad Company; that the Railroad Company submitted formal contracts to the associates, which may be considered in view of the modifications a counteroffer; and that these contracts were accepted and executed by the Western Indiana Gravel Company, a corporation, acting through its agent and president, M. A. Neville, and at the same time, but not until then, accepted and executed by the Railroad.

On these facts we find no prior contract between the Railroad and the associates which the latter could assign to the new corporation, as they attempted to do by the resolution of March 3; and there was, of course, no such assignment. The only contracts were those executed by the petitioner corporation on March 1.

The present case is very similar on its facts to *Kaufmann & Baer Co.* v. *Heiner*, 34 Fed. (2d) 698, decided by the United States District Court for the Western District of Pennsylvania, the principal differences being that in the *Kaufmann* case, the taxpayers had concluded before incorporation an agreement for a lease and the terms of that agreement provided for the creation of a corporation, with a certain paid-in capital, etc., and which should, and did, become the lessee. The contentions of the taxpayer, that the value of the lease should be included in its paid-in surplus and that a deduction should be allowed for the lease's exhaustion, are substantially the same as here. The court in that case said:

> The facts in this case do not disclose that anything of value was paid in to the corporation in connection with this alleged lease. The incorporators themselves bargained for this lease to be made to the corporation. They did not assign the lease to the corporation; in the promotion and organization of the corporation the lease was provided for. * * * There was nothing paid in to this corporation by anybody, so far as this lease was concerned. The parties themselves negotiating for the lease had in contemplation that it could be performed only by the corporation; and the corporation acquired the lease not by assignment but by direct grant from the Oliver Estate. The shareholders in the corporation really contributed nothing of value to the corporation so far as this lease is concerned.
>
> The position we have taken is supported by the Circuit Court of Appeals, 4th Circuit, in *Kleeson* vs. *Blair*, 28 Fed. (2d) 557. The views we have taken here, and those expressed by the 4th Circuit are in entire accord with the Supreme Court in the case of *LaBelle Iron Works* vs. *U. S.*, 256 U. S. 377 (388) * * *.

Cf. *Amalgamated Products Co.*, 12 B. T. A. 659.

We hold, therefore, that there was here no such paying in of property for shares as to bring that property within the purview

of the statute for purposes of inclusion in the petitioner's invested capital.

The petitioner's second contention is that a deduction of $10,000 a year for ten years should have been allowed by way of exhaustion of the value of the contracts upon acquisition. As the contracts cost the petitioner nothing, there is no basis for an exhaustion allowance.

We come now to the third issue, whether the petitioner is entitled to special assessment under section 328 of the Revenue Acts of 1918 and 1921, by reason of its coming within one of the categories of section 327. The relevant portion of the last named section (identical in the two acts) is set out by footnote.[1]

The petitioner rests its claim to special assessment on two grounds: (1) borrowed capital; (2) the exclusion of the value of the contracts in question. We shall consider them in this order.

The invested capital of petitioner, not including any value the gravel contracts might have had, was for 1920, $67,062.43; and 1921, $122,201.22. The peak of the petitioner's borrowings was always reached in midsummer and the peak of its accounts receivable for both years was also reached in the same months, the rise and fall of both accounts being explained by the fact that petitioner's productive season lay between May and November.

But mere proof of borrowings does not prove an abnormality. We are not told by the petitioner that the relation of borrowed money to invested capital here shown is unusual in the gravel business, and, in the absence of such evidence, there is nothing upon which we may base an opinion that the use of borrowed money in these amounts created an abnormality. *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566; *Camden Woolen Co.*, 12 B. T. A. 1277; *W. E. Beckmann Bakers' & Confectioners' Supply Co.*, 13 B. T. A. 860; *Mutual Oil Co. of Arizona*, 14 B. T. A. 538; and *Peck Coal Corporation*, 15 B. T. A. 189.

It remains to decide whether the exclusion from invested capital of the value of the four contracts in itself creates an abnormality. It is perfectly clear, at the outset, that the mere statutory exclusion of an asset from invested capital does not of itself justify special assessment. *Morris & Co.*, 1 B. T. A. 704; *W. E. Beckmann Bakers'*

---

[1] SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

\*     \*     \*     \*     \*     \*     \*

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. \*   \*   \*

& *Confectioners' Supply Co.*, *supra; Sanford Cotton Mills*, 14 B. T. A. 1210; *Enameled Metals Co.*, 14 B. T. A. 1392; *J. D. Williams, Inc.*, 22 B. T. A. 21.

Engrafted on this rule, however, is the exception adopted in *J. M. and M. S. Browning Co.*, 6 B. T. A. 914, where the asset excluded for statutory reasons is a substantial part of its capital and productive of a very substantial part of the taxpayer's income. *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *Detroit Opera House*, 13 B. T. A. 587; *Rothschild Colortype Co.*, 14 B. T. A. 718.

But the petitioner can not avail itself of this exception, for in the above cases the asset excluded for statutory reasons was paid in for stock, and while the asset was not part of the invested capital, as defined by the statute, it was nevertheless an unrecognized capital asset largely productive of the petitioner's income, so that its exclusion would result in abnormality. Such is not the case here. The contracts were not paid in for stock, so that the petitioner has not met the first condition of its claim. *Electric Appliance Co.*, 19 B. T. A. 707; *Washington Electric Supply Co.*, 9 B. T. A. 1399. Moreover, the petitioner did not have a patent right or even a leasehold. The most that it had was a mere contract right which the Railroad might terminate on ninety days' notice, " upon equitable terms, considering at such time the investment in and value of the second party's plant for such operations, but excluding any consideration of future profits." The value of that right has not been established. The petitioner here is attempting to attribute to the contract the value of future profits which might or might not be realized, and which, even if realized, would result not wholly from the contract itself, but also from the petitioner's labor and its capital invested in physical equipment. We can not find in this situation any abnormality. As we said in *Coca-Cola Bottling Works of Pittsburgh*, 19 B. T. A. 267, with respect to a contract (excluded for invested capital purposes) for bottling and selling Coca-Cola in a given territory:

* * * The profits they realize in a given year are the result of the existence of these contracts, but whether they do realize profits is dependent upon factors outside of the contracts, such as management of the concern, business method pursued, zeal with which they push the business, capital investment necessary for carrying on the business, etc. And where the full capital which is invested in the business and which is necessary for its operation is recognized for invested capital purposes, we do not think an abnormality exists because there has not been taken into consideration a value which may attach to the contract under which the profits were realized, but which represents no investment on the part of the petitioner. Cf. *Hub Furniture Co.*, 11 B. T. A. 303; *Mutual Oil Co. of Arizona*, 14 B. T. A. 538; *Troy Motor Sales Co.*, 14 B. T. A. 546; and *Moses-Rosenthal Co.*, 17 B. T. A. 622.

Cf. *Keystone Wood Products Co.*, 19 B. T. A. 1116; *Standard Slag Co.*, 20 B. T. A. 503.

We find no reason, therefore, to allow petitioner the benefit of assessment under sections 327 and 328 of the revenue acts.

*Judgment will be entered for the respondent.*