**CONTINENTAL OIL CO. v. UNITED STATES.**

**VERRILL v. SAME.**

Nos. 45730, 46029.

Court of Claims.

Nov. 5, 1945.

The separate petitions of the Continental Oil Company, a Delaware corporation, and of Robinson Verrill as Successor-Trustee of Continental Oil Company, a Maine corporation, predicate recovery upon the same claim for refund of tax and each petition prays for judgment in the same amount, namely, $62,423.32, claimed to represent an overpayment of consolidated income and profits tax for 1920 by the Elk Basin Consolidated Petroleum Company. Each plaintiff claims as a successor in interest to the Elk Basin Company which paid the tax in controversy for itself and certain subsidiary corporations whose incomes were consolidated and reported for federal tax purposes upon a single consolidated return for the calendar year 1920.

January 1, 1920, the Elk Basin Company acquired all the outstanding capital stock of two other corporations in exchange for 600,000 shares of its own capital stock; and on March 15, 1920, Elk Basin Company acquired all the outstanding capital stock of Mutual Oil Company of Maine and all the outstanding stock of each of its three subsidiary corporations in exchange for an additional 600,000 shares of its own stock.

The question presented is the valuation for invested capital purposes of the stock so paid in for the stock of the Elk Basin Company.

### Special Findings of Fact.

1. Continental Oil Company, plaintiff in No. 45730, is a Delaware corporation with its principal office and place of business in Ponca City, Oklahoma.

Robinson Verrill, plaintiff in No. 46029, is the duly appointed and qualified trustee of the Continental Oil Company, a Maine corporation (not the same corporation mentioned in the paragraph next above) dissolved by decree of the Supreme Judicial Court of Maine on December 9, 1931, with authority and power under that decree to receive and collect all assets and money due the corporation, pay all debts, and sell and dispose of the corporation's remaining assets, and to wind up its affairs. He was and is expressly authorized by court order to institute and maintain suit No. 46029.

Each of the above plaintiffs claims the same sum, $62,423.32, with interest thereon as allowed by law, and plaintiff, Robinson Verrill, admits and alleges that he is not entitled to recover if a recovery is had by Continental Oil Company. Both plaintiffs allege the same cause of action against the defendant.

2. On January 1, 1920, and for some time prior thereto and thereafter, the Elk Basin Consolidated Petroleum Company was a Maine corporation, hereinafter sometime referred to as the "Elk Basin Company," engaged in the production, refining and marketing of petroleum and petroleum products.

3. On March 15, 1921, Elk Basin Company filed a tentative, and on May 14, 1921, filed its completed federal consolidated income and excess profits tax return for the calendar year 1920. That return included the income of Elk Basin Company, Grass Creek Petroleum Company, Keoughan-Hurst Drilling Company, Mutual Oil Company of Maine, Mutual Oil Company of Arizona, Mutual Refining and Producing Company and Northwestern Oil Refining Company, for the entire calendar year 1920. It reported a consolidated invested capital of $8,721,214.84, a consolidated net taxable income of $1,167,974.45, and a total tax of $200,707.45, together with interest of $201.77 accrued at that time. Such tax and interest were timely assessed against and paid out of its own funds by Elk Basin Company, as parent, in installments during 1921, as follows:

| Date | Tax | Interest | Totals |
|---|---|---|---|
| March 15 | $30,000.00 | | $30,000.00 |
| May 15 | 20,176.86 | $201.77 | 20,378.63 |
| June 15 | 50,176.86 | | 50,176.86 |
| Sept. 12 | 50,176.86 | | 50,176.86 |
| Dec. 16 | 50,176.86 | | 50,176.86 |
| | 200,707.44 | 201.77 | 200,909.21 |

No part of the total payment of $200,909.21 above has ever been repaid by the United States to either of the plaintiffs herein or otherwise.

4. The Commissioner of Internal Revenue audited the consolidated return filed as

878

stated in the preceding finding and determined that it erroneously included the income of Mutual Oil Company of Maine and its three subsidiaries (Mutual Oil Company of Arizona, Mutual Refining and Producing Company, and Northwestern Oil Refining Company) for the period January 1 to March 14, 1920. That determination was based upon the premise that the Mutual Oil Company of Maine and its three subsidiaries existed as a separate affiliation for the period January 1 to March 14, 1920, and had an affiliated relationship for federal tax purposes with the Elk Basin Company only from March 15 to December 31, 1920, inclusive. The Commissioner held that there were two different and separate affiliated groups of corporations; that the change in affiliation required separate computations for the fractional parts of the year 1920; that a separate consolidated return should have been filed for the period January 1 to March 14, 1920, both inclusive, by the Mutual Oil Company of Maine for itself and its three subsidiaries; and that its income for that period should not have been included in the return filed May 14, 1921, by Elk Basin Company as set out above. The income of the Mutual Oil Company of Maine and its three subsidiaries, determined separately for the period January 1 to March 14, 1920, both inclusive, was calculated to be $196,469.18 and their invested capital was calculated to be $665,132.55, representing an invested capital of $3,192,-636.27 at January 1, 1920, apportioned to the first fractional part of 1920.

5. On March 15, 1920, and prior thereto, Mutual Oil Company of Maine, a corporation organized under the laws of the State of Maine, had as subsidiaries and owned all of the outstanding capital stock of Mutual Oil Company of Arizona, Mutual Refining and Producing Company, and Northwestern Oil Refining Company, then engaged in the production, refining, and marketing of petroleum and petroleum products. Elk Basin Company, by the issuance of 600,000 shares of its own stock on March 15, 1920, simultaneously acquired all of the outstanding capital stock of Mutual Oil Company of Maine and all of the outstanding capital stock of each of its three subsidiary corporations.

6. On January 1, 1920, Elk Basin Company also acquired all of the outstanding capital stock of the Grass Creek Petroleum Company (incorporated in 1916 under the laws of the State of Maine) by the issuance of 133,333⅓ shares of its capital stock, and on the same day acquired all of the outstanding capital stock of Keoughan-Hurst Drilling Company (incorporated in 1916 under the laws of the State of Wyoming) by the issuance of 466,666⅔ shares of its capital stock.

The par value of the capital stock of Elk Basin Company was $5.00 per share.

7. During years after 1920 certain material changes occurred in the corporations mentioned above, as follows:

On April 30, 1921, the Northwestern Oil Refining Company and the Mutual Refining and Producing Company each transferred without consideration all of its property and assets to the Mutual Oil Company of Arizona.

On December 22, 1921, Elk Basin Company changed its name to Mutual Oil Company.

On December 31, 1921, Mutual Oil Company of Arizona transferred without consideration all of its property and assets (including the property and assets of Northwestern Oil Refining Company and Mutual Refining and Producing Company which it acquired as aforesaid) to Mutual Oil Company, known prior to December 22, 1921, as the Elk Basin Consolidated Petroleum Company.

Mutual Oil Company of Maine and Mutual Refining and Producing Company dissolved in 1921. Northwestern Oil Refining Company and Mutual Oil Company of Arizona dissolved in 1922.

Mutual Oil Company (successor to Elk Basin Company, Mutual Oil Company of Arizona, Northwestern Oil Refining Company and Mutual Refining and Producing Company, as aforesaid) changed its name in 1925 to Continental Oil Company of Maine which entered into a written agreement on April 30, 1929, with the Marland Oil Company, a Delaware corporation, transferring all of its assets to the latter in exchange for shares of its capital stock. Marland Oil Company acquired the use of the name Continental Oil Company and duly changed its name accordingly.

8. On April 30, 1929, Continental Oil Company of Maine entered into a written agreement entitled Plan of Reorganization and Agreement with the Marland Oil Company, a Delaware corporation, wherein and whereby the Marland Oil Company acquired the assets of the Continental Oil Company of Maine (formerly known as Elk

Basin Company) in exchange for shares of the capital stock, and thereafter, upon consummation of that agreement, acquired the use of the name Continental Oil Company and duly changed its name accordingly. It is the plaintiff in case No. 45730.

The eleventh paragraph of that agreement is as follows:

"Eleventh. Marland will pay and discharge any Federal and/or State Income Tax Liability to which Marland and/or Continental may be subject and will assume and pay all other liabilities which may arise or result from the carrying out of this plan of reorganization and agreement."

9. The adjustments made by the Commissioner on the consolidated federal income and excess profits tax return for the calendar year 1920 (mentioned in finding 4 above) resulted in a separation of taxable income and invested capital for the two taxable periods (a) January 1 to March 14, 1920, and (b) March 15 to December 31, 1920, inclusive.

During 1925 the Continental Oil Company of Maine received a so-called 60-day letter proposing to assess a deficiency of $56,113.14, for the period of January 1 to March 14, 1920, inclusive, against it as transferee of the assets of Mutual Oil Company of Maine and its three subsidiaries. An appeal was taken from that letter to the United States Board of Tax Appeals. A decision determining no deficiency was promulgated May 19, 1931, and is reported in 23 B.T.A. 311. The Commissioner appealed therefrom to the Court of Appeals of the District of Columbia which reversed and remanded the decision below. Helvering v. Continental Oil Co., 68 F.2d 750, 63 App.D.C. 5. The United States Supreme Court denied a petition for writ of certiorari, 292 U.S. 627, 54 S.Ct. 629, 78 L.Ed. 1481. Upon remand, the Board of Tax Appeals reconsidered the matter and determined deficiencies against the Continental Oil Company, 34 B.T.A. 29. This decision was appealed to the Court of Appeals of the District of Columbia and affirmed. Continental Oil Co. v. Helvering, 100 F. 2d 101, 69 App.D.C. 236. A deficiency was thereafter assessed and defendant therein filed a petition in the action in the Supreme Judicial Court in Equity, County of Cumberland, State of Maine, entitled "George F. Smith, Plaintiff, v. Continental Oil Company, Defendant" (which is the same action mentioned in paragraph First of the peti-

tion in case No. 46029) to compel payment of such deficiency. A decision on that petition was entered February 21, 1944, in favor of the United States and the Court entered a decree on April 13, 1944, directing payment on or before May 16, 1944, of the sum of $61,523.34, with interest at 6% per annum from February 15, 1937, to the date of payment. Payment was made by check on May 16, 1944, in the amount of $88,142.44.

10. On March 9, 1925, a claim for refund of $200,707.45, for the calendar year 1920, on Treasury Department Form 843, was filed with the Collector of Internal Revenue at Denver, Colorado. This claim was executed in the name of Elk Basin Company and set forth as grounds a statement "That the assessments are before the department and that facts have developed which will be presented in connection with appeals from proposed additional tax to show income smaller and invested capital larger than reported, entitling the taxpayer to refund of all or a greater part of the taxes paid." That refund claim was one for an overpayment of tax alleged to have arisen by reason of the exclusion of income and invested capital of the Mutual Oil Company of Maine and its three subsidiaries for the first two and a half months of 1920, as stated above, and claimed that such refund resulted from an understatement of invested capital.

11. Upon an examination of the refund claim filed March 9, 1925, the Commission determined an overpayment of tax by the Elk Basin Company in the sum of $12,779.-97 and duly issued a certificate of overassessment therefor, together with a check in such amount, plus accrued interest thereon of $4,475.09. That check was rejected and returned by the Continental Oil Company of Maine to the Commissioner, together with the certificate of overassessment. The check and the certificate were subsequently cancelled and the money repaid into the Treasury of the United States. In making that determination, the Commissioner computed a consolidated net income of $1,084,-800.52 and a consolidated invested capital as follows:

### Invested Capital

| | |
|---|---:|
| Capital Stock | $3,000,000.00 |
| Surplus paid in | 119,314.03 |
| Reserves for income tax | 10,962.46 |
| Surplus, earned | 176,266.25 |
| Total | 3,306,542.74 |

Additions:
(a) Acquisition of Grass Creek Petroleum Co. $1,000,000.00
(b) Acquisition of Keoughan Hurst Drilling Co. .................. 2,333,333.33
(c) Acquisition of Mutual Oil Co. of Maine, and subsidiaries .......... 2,393,442.62
                                                   5,726,775.95

Total .......................... 9,033,318.69
Reductions:
(d) Dividend ............... $137,736.49
(e) Income tax for 1919.... 4,626.29
(f) Deduction for inadmissibles ................ 964,224.17
                                                   1,106,586.95

Adjusted invested capital...... 7,926,731.74

12. In reaching the determination upon which the certificate of overassessment was based and in issuing the check for $17,255.06, the Commissioner in computing invested capital declined to take into account and give effect to a claimed fair market value for the capital stock of Elk Basin Company issued in exchange for the capital stock of Keoughan-Hurst Drilling Company, Mutual Oil Company of Maine, Mutual Oil Company of Arizona, Mutual Refining and Producing Company and Northwestern Oil Refining Company, as stated above, but did determine invested capital from the basis of the value for the assets behind such stocks. An application was made to reopen and reconsider the claim for refund. This was granted but action thereon was deferred by mutual agreement pending final decision upon the pending appeal to the Board of Tax Appeals, mentioned above. After the Board proceedings were concluded, the claim for refund was reconsidered and disallowed and rejected in full by the Commissioner on December 13, 1941.

13. The consolidated net income of Elk Basin Company for the calendar year 1920, which is subject to income and profits taxes for that year, is the sum of $1,087,025.43. This sum includes an adjustment for depletion of $38,576.29 in lieu of the amount of $39,942.40 claimed in plaintiffs' petitions.

14. Elk Basin Petroleum Company was organized December 11, 1916, with an authorized capital stock of 400,000 shares. On November 6, 1919, its authorized capital stock was increased to 1,000,000 shares. On January 6, 1920, its name was changed to Elk Basin Consolidated Petroleum Company and its authorized capital stock was increased to 3,000,000 shares, par value $5.00 per share. For some time prior to March 15, 1920, and thereafter, this stock was traded in on the New York Curb Exchange. Quotations appear below. These are all for stock of Elk Basin Petroleum Company and Elk Basin Consolidated Petroleum Company. They were taken from the New York Times and from the Financial & Commerce Chronicle, both being daily newspapers of general public circulation in the City and State of New York and elsewhere.

| Week ending | Low | High | Sales for week |
|---|---|---|---|
| October 3, 1919..... | 8⅝ | 8⅞ | 700 shares. |
| 10......... | 9⅛ | 9½ | 700 shares. |
| 17......... | 8⅝ | 9¼ | 1,900 shares. |
| 24......... | 9 | 9 | 00 shares. |
| 31......... | | | No sales reported. |
| November 7, 1919... | 8½ | 8½ | 100 shares. |
| 14......... | 8¼ | 8⅜ | 400 shares. |
| 21......... | 8 | 8¾ | 47,800 shares. |
| 28......... | 7¾ | 8⅞ | 127,500 shares. |
| December 5, 1919... | 7¼ | 7¾ | 6,500 shares. |
| 12......... | 7½ | 8 | 1,850 shares. |
| 19......... | | | No sales reported. |
| 26......... | 8¼ | 8⅝ | 1,800 shares. |
| January 2, 1920..... | 8½ | 9 | 3,600 shares. |
| 9......... | 8⅞ | 9 | 4,700 shares. |
| 16......... | 8⅝ | 8⅞ | 1,500 shares. |
| 23......... | 8½ | 9⅝ | 25,100 shares. |
| 30......... | 9¼ | 9⅝ | 36,800 shares. |
| February 6, 1920... | 8⅝ | 9⅝ | 11,500 shares. |
| 13......... | 8 | 8⅞ | 11,200 shares. |
| 20......... | 8¼ | 8⅜ | 20,000 shares. |
| 27......... | 7⅞ | 8⅝ | 9,200 shares. |
| March 5, 1920....... | 7¾ | 8⅞ | 13,500 shares. |
| 12......... | 8¾ | 11¼ | 45,500 shares. |
| 19......... | 10 | 10¾ | 12,700 shares. |
| 26......... | 9½ | 10¼ | 10,200 shares. |
| December 22, 1919.. | 8¼ | 8½ | |
| 23......... | 8½ | 8⅝ | |
| 24....... | | | No sales reported. |
| 26....... | 8½ | 8⅝ | |
| 27....... | | | No sales reported. |
| 29....... | 8⅝ | 8⅞ | |
| 30....... | 8½ | 8⅝ | |
| 31....... | 8⅝ | 8¾ | |
| March 10, 1920...... | 9⅞ | 10 | |
| 11......... | 9⅞ | 10¼ | |
| 12......... | 10⅜ | 11⅛ | |
| 13......... | 10⅞ | 11¼ | |
| 14......... | 10⅜ | 10¾ | |
| 15......... | 9 | 11¼ | |
| 16......... | 10 | 10⅜ | |
| 17......... | 10 | 10½ | |
| 18......... | | | No sales reported. |
| 19......... | 10 | 10¼ | |
| 20......... | 10 | 10¼ | |

The Financial & Commercial Chronicle, in its issue of December 27, 1919, showing New York Curb Market quotations for the week December 20 to 26, inclusive, carried on the same page with the quotations of

prices for Elk Basin Petroleum Company stock a statement reading:

"New York 'curb' Market. Below we give a record of the transactions in the outside security market from Dec. 20 to Dec. 26, both inclusive. It covers the week ending Friday afternoon. On the 'Curb' there are no restrictions whatever. Any security may be dealt in and anyone can meet there and make prices and have them included in the lists of those who make it a business to furnish daily records of the transactions. The possibility that fictitious transactions may creep in, or even that dealings in spurious securities may be included, should, hence, always be kept in mind, particularly as regards mining shares. In the circumstances, it is out of the question for anyone to vouch for the absolute trustworthiness of this record of 'Curb' transactions, and we give it for what it may be worth."

A similar statement appeared in the issues showing quotations for the weeks ending December 5, 12, and 19, 1919, and for weeks ending March 5 and 12, 1920. No similar statement appeared in any of the issues of the New York Times, which also carried quotations of the Elk Basin Stock.

15. The Elk Basin Petroleum Company filed a federal income and profits tax return for the calendar year 1919 reporting gross profits of $265,489.31, deductions therefrom of $152,272.01, a net taxable income of $113,217.30, an invested capital of $1,980,737.14, and a total federal tax due of $10,962.46.

The Grass Creek Petroleum Company filed a similar tax return for the calendar year 1919 reporting gross profits of $337,134.78, deductions therefrom of $306,700.79, a net taxable income of $30,433.99, an invested capital of $1,212,094.72, and a total federal tax due of $2,843.40. The Commissioner adjusted this return to show a corrected invested capital of $729,558.14 and a corrected net taxable income of $105,595.52, producing a deficiency tax of $15,477.71 which was assessed in February 1921.

The Keoughan-Hurst Drilling Company filed a similar tax return for the calendar year 1919 reporting gross profits of $83,372.75 from drilling operations only, deductions therefrom of $141,410.08, a net loss of $58,037.33, an invested capital of $1,916,891.84, and no tax due.

The Mutual Oil Company of Maine filed a consolidated federal income and profits tax return for itself and its three affiliated subsidiaries (Mutual Oil Company of Arizona, Mutual Refining and Producing Company and Northwestern Oil Refining Company) for the calendar year 1919 reporting a gross profit of $1,490,247.76, deductions therefrom of $982,302.26, a net taxable income of $507,945.50, an invested capital of $3,023,841.18 and a total tax due of $97,941.43.

16. The Elk Basin Petroleum Company addressed a letter to its stockholders on December 19, 1919, as follows:

"Your Board of Directors has voted, subject to the approval of the stockholders, to increase its capital stock from 1,000,000 shares, of a par value of $5.00 each, a total of $5,000,000, to 3,000,000 shares, of a par value of $5.00 each, a total of $15,000,000; there is now outstanding $3,000,000 of the capital stock of the Company.

"The Board has voted to set aside for the acquisition of the capital stock of the Keoughan-Hurst Drilling Company, a Wyoming corporation, $2,333,333 par value of its capital stock; and for the acquisition of the capital stock of the Grass Creek Petroleum Company, a Maine corporation, $666,667 par value of its capital stock. The holders of 75% of the outstanding capital stock of the Keoughan-Hurst Drilling Company, and 60% of the outstanding capital stock of the Grass Creek Petroleum Company have already agreed to accept the above proposition and it is the belief of the undersigned that practically all shareholders of both companies will accept the offer of exchange about to be made, so that all the assets of these two companies will become the Property of the Elk Basin Petroleum Company. With these two transactions completed there will be outstanding $6,000,000 par value of the capital stock of your Company, and $9,000,000 will remain unissued for future corporate needs and the enlargement of the scope of its activities.

"The holdings of your Company with the above acquisitions completed will consist of valuable royalties and leasehold interests in the Elk Basin, Grass Creek, Big Muddy and Rock River fields of Wyoming; Ranger and Burkburnett fields of Texas; Homer and Bull Bayou fields of Louisiana; and in the Beggs, Osage and Comanche fields of Oklahoma; also promising prospects in holdings in Texas, Kansas, Louisiana, New

Mexico, and Colorado. The Company will have interests in over 130,000 acres.

"Net earnings of the 3 companies before depletion, depreciation and taxes are now running at the rate of approximately $1,-200,000 per annum. The Company has a large interest in the Rock River Field of Wyoming, which is being operated by the Ohio Oil Company and upon which that Company is now carrying on an extensive drilling programme and large earnings should be realized from this increased production; your Company will have when these transactions are consummated several strings of tools running in proven territory in the Ranger Field in Texas, which it is confidently expected will greatly increase its earnings. The regular quarterly dividend at the rate of 10% per annum on the outstanding $6,000,000 of stock will be paid February 1, 1920.

"The Company will be in control by virtue of the above acquisitions of approximately $2,000,000 in cash; also drilling tools, and other equipment valued conservatively at $500,000 making over 40% of its capital represented by cash and other liquid assets.

"It will be the policy of the Company to extend its development operations in the producing fields of the Mid-Continent, Wyoming, Texas and Louisiana, and it is the belief of your Board of Directors that the Company as thus capitalized will have bright prospects for developing into one of the important factors in the production of oil in the territories mentioned.

"The active field management of the Company will be in the hands of Mr. S. H. Keoughan of Denver, Colorado, one of the most successful and economical oil operators in the West."

A copy of this letter appeared on page 2443 of the issue of the Financial and Commercial Chronicle of December 27, 1919.

17. During the autumn of 1919, the firm of C. H. Pforzheimer & Company, brokers and dealers in securities, specializing in the securities of companies engaged in the production, refining, and marketing of petroleum products, with offices at No. 25 Broad Street in New York City, was an active dealer in the stock of Elk Basin Petroleum Company, both in the capacity of brokers and in that of traders.

In October or November 1919, Elk Basin Petroleum Company offered its stockholders the right to subscribe to 200,000 shares of its capital stock (par value $5 per share) at a price of $7.50 per share, making an aggregate total of $1,500,000. The Pforzheimer firm had formed a syndicate to take up at the same price so much of the Elk Basin stock as was not subscribed and paid for by the stockholders. On November 28, 1919, 133,333⅓ shares were sold, 66,151⅔ shares were sold on December 9, and 515 shares were sold on December 19, 1919, aggregating 200,000 shares, at a price of $7.50 per share. Elk Basin Petroleum Company paid a broker's commission thereon of $150,000.

By written agreement dated December 16, 1919, Keoughan-Hurst Drilling Company sold 100,000 shares of its capital stock (par value $5 per share) to the Pforzheimer firm at a price of $8.50 per share. This sale was actually made December 27, 1919, for cash. It was part of a plan whereby Elk Basin Petroleum Company was to acquire all of the outstanding capital stock of Keoughan-Hurst Drilling Company and Grass Creek Petroleum Company by an exchange of stock for stock, also to change its name, the number of its directors, and to secure the election of S. H. Keoughan and J. T. Hurst as such directors.

In another written agreement, also dated December 16, 1919, the Pforzheimer firm contracted to exchange its 100,000 shares of Keoughan-Hurst stock for stock of the Elk Basin Company as part of the same plan mentioned in the paragraph next above whereby the Elk Basin Company was to acquire all of the outstanding Keoughan-Hurst stock (300,000 shares, including the 100,000 mentioned above) in exchange for 466,666 shares of its own stock. C. H. Pforzheimer individually agreed to negotiate the contemplated transaction. It was also agreed, as part of the same plan, that the Elk Basin stock—other than that acquired by the Pforzheimer firm—would be withheld from the market until August 1, 1920. There was no restriction upon the sale of the Elk Basin stock acquired by the Pforzheimer firm. These agreements were carried out.

18. On July 31, 1920, Elk Basin Consolidated Petroleum Company executed and filed its federal capital stock tax return for the year 1921, reporting 1,800,000 shares of capital stock outstanding with a par value of $5.00 per share aggregating $9,000,000, a surplus of $1,193,359.84, a total value of $10,193,359.84 for capital stock tax computation, and a tax thereon of $10,-

188. Exhibit B to that return reported New York Curb Market quotations for its stock as follows:

| Date | Shares out-standing | Price |
|---|---|---|
| January 1920 | 1,200,000 | $9.25 |
| February | 1,200,000 | 9.12½ |
| March | 1,800,000 | 8.12½ |
| April | 1,800,000 | 9.50 |
| May | 1,800,000 | 8.25 |
| June | 1,800,000 | 8.00 |
| Average | 1,633,333 | 8.71 |

Total value, $14,226,330.43.

The Commissioner addressed a letter to the taxpayer on October 3, 1921, proposing an additional tax of $4,033 upon its return, based upon a fair value of $14,226,330 for its capital stock. The Elk Basin Consolidated Petroleum Company replied by letter dated October 26, 1921, under oath, stating in substance that par value ($5 per share) of its stock should be used rather than the quoted Curb market value for its capital stock for the reasons (a) that sometime before July 1, 1920, all production of Keoughan-Hurst Drilling Company (previously something like two thousand barrels of daily production in Texas) had ceased; (b) that this fact had not become generally known to the public, did render the stock of Elk Basin Consolidated Petroleum Company much less valuable, but had not yet affected its market value; (c) that the market price of the Elk Basin stock after consolidation of Elk Basin Petroleum Company with the other corporations had not reflected the effect of the consolidation and was based upon the substantial dividend record of the original small company whose name "Elk Basin" was widely and favorably known; (d) that the market quotations for Elk Basin stock were not a fair criterion of its value since the block of stock exchanged for the securities of the Mutual Oil Company (600,000 shares) had been placed in escrow and remained so and that the block of stock exchanged for the Keoughan-Hurst stock had also been placed in escrow and that the market quotation of the Elk Basin stock was thus maintained at a higher level than would have been the case had the entire number of shares been subject to sale; and (e) that the market for the Elk Basin stock on the New York Curb was strongly supported by certain New York Curb brokers, who, by furnishing a ready and strong market for this stock, maintained its price at considerably above the value reflected by the books of the corporation. The Commissioner accepted the statements in the letter of October 26, 1921, from the Elk Basin Consolidated Petroleum Company as true and accepted its capital stock tax return and the value therein reported at $5.00 per share as correct.

19. The consolidated invested capital of the Elk Basin Consolidated Petroleum Company for the calendar year 1920, after giving effect to all adjustments, including the acquisitions of stock, on January 1 and March 15, 1920, referred to in findings 5 and 6, was in the amount of $7,926,731.74.

Arthur B. Hyman, of New York City (Morris Katz, of New York City, on the brief), for plaintiff.

John A. Rees, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES and MADDEN, Judges.

LITTLETON, Judge.

It would serve no useful purpose to recount here the many facts connected with the long history of litigation which has attended this tax case in the Internal Revenue Bureau, the Tax Court, and the other courts prior to the filing of this petition. It is likewise unnecessary to discuss the corporate history of plaintiff and the several related and affiliated corporations. Substantially, the entire issue in the case is a relatively simple one: namely, the actual cash value of certain stock of other corporations paid in for stock of the Elk Basin Company, the predecessor of plaintiff, and unless that issue is determined favorably to plaintiff there can be no recovery.

While separate plaintiffs are involved in the two suits, i. e., Continental Oil Company, a Delaware corporation, No. 45730, and Robinson Verrill, as Successor-Trustee of Continental Oil Company, a Maine corporation, No. 46029, the same cause of action is set up in each petition and the second suit was filed in order to preserve and protect the rights of the Maine corporation in the event it should be decided that the corporate plaintiff in No. 45730 is precluded by Section 3477 of the Revised Statutes, 31 U.S.C.A. § 203, from recovery under the first petition. No such defense, however, is applicable and

has not been raised by the defendant. The second petition in No. 46029 will therefore be dismissed.

The Continental Oil Company, plaintiff in No. 45730, is the successor after various corporate changes to the Elk Basin Consolidated Petroleum Company and for convenience will generally be referred to as the plaintiff without regard to the various changes in corporate name and corporate status.

For some time prior to January 1, 1920, plaintiff had been engaged in the production, refining, and marketing of petroleum and petroleum products, and shortly prior to that date it embarked upon a plan of expanding its holdings and activities. Plaintiff acquired all the outstanding capital stock of two other corporations on January 1, 1920, in exchange for 600,000 shares of its own capital stock. Plaintiff by the issuance of 600,000 shares of its own stock March 15, 1920, acquired all the outstanding capital stock of another company which had three wholly owned subsidiary corporations whose stock was also acquired.

Plaintiffs filed a consolidated income and excess profits tax return for the calendar year 1920 on May 14, 1921, and included therein its own income and invested capital, the income and invested capital of the two corporations which were acquired on January 1, 1920, and the income and invested capital of the four corporations which were acquired on March 15, 1920, all the corporations in the group being considered as a part of a consolidated group for the entire calendar year 1920. The return showed a consolidated invested capital of $8,721,214.84, a consolidated net taxable income of $1,167,974.45, and a total tax due thereon of $200,707.45. The tax shown due, together with interest of $201.77, was paid in five installments during 1921.

The Commissioner audited that return and determined that the corporation with three subsidiaries, acquired on March 15, 1920, should be considered as a separate affiliated group for the period January 1 to March 15, 1920, and accordingly determined a separate assessment against that group for that period. The taxable income of that group for such period was computed in the amount of $196,469.18 and its invested capital in the amount of $665,-132.55, such latter amount representing an invested capital at January 1, 1920, of $3,-192,636.27, apportioned for the fractional period of 1920 for which a separate return

was required. After extended litigation, a deficiency against that group was finally determined which was paid with interest in the total amount of $88,142.44 (finding 9).

In the meantime plaintiff filed a claim for refund on March 9, 1925, for the entire tax of $200,707.45 which it had paid on the consolidated return filed for 1920 on the ground that the income for the consolidated group had been overstated and the invested capital understated. The principal basis of the ground stated in that claim was alleged to have arisen by reason of the exclusion from the plaintiff consolidated group of the corporations acquired by plaintiff March 15, 1920, heretofore referred to, and that with such exclusion there had been an understatement of invested capital. After an examination of that claim, the Commissioner computed a consolidated net income in the amount of $1,084,800.52, and consolidated invested capital of $7,926,731.-74. In this computation the Commissioner allowed additions to consolidated invested capital of $3,333,333.33 and $2,393,442.62 on account of the acquisitions of stock of other corporations on January 1 and March 15, 1920, respectively, heretofore referred to.

On the basis of that computation the Commissioner determined an overpayment of $12,779.97 and duly issued a certificate of overassessment therefor together with a check in that amount plus accrued interest thereon of $4,475.09 (findings 10, 11, and 12). Plaintiff refused to accept this check and returned it to the Commissioner, together with the certificate of overassessment. The check and the certificate were subsequently canceled and the money repaid into the Treasury of the United States. In making that determination the Commissioner declined to give effect to the claimed market value of plaintiff's stock which was issued for the stock of the groups of corporations on January 1 and March 15, 1920, but did determine additions to plaintiff's consolidated invested capital by reason of those acquisitions on the basis of the value of the assets behind such stock which he determined represented the actual cash value of such stock. On application of plaintiff the claim for refund was later reconsidered by the Commissioner after plaintiff had rejected the determined overpayment and check, but on such reconsideration the claim was rejected in full December 13, 1941.

The position which plaintiff takes in this suit is that in determining its consolidated

invested capital for 1920, the stock of the group of corporations acquired on January 1, 1920, and the stock of the group acquired on March 15, 1920, represented tangible property paid in for stock of plaintiff on those dates and by according to such stock its proper value invested capital will be substantially increased over that determined by the Commissioner and the refund sought through this suit will result. Section 326 (a) (2) of the Revenue Act of 1918, 40 Stat. 1092, contains the following provision with respect to the inclusion in invested capital of tangible property paid in for stock:

"Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus; * * *."

■ The governing statute, section 325 (a) of the Revenue Act of 1918, 40 Stat. 1091, includes in the definition of "tangible property" stocks, bonds, and other evidences of indebtedness and this court has held that where a corporation issues its stock for the stock of another corporation, the stock so acquired is to be considered as tangible property paid in for stock. United Cigar Stores v. United States, 62 Ct.Cl. 134, certiorari denied 275 U.S. 576, 48 S. Ct. 83, 72 L.Ed. 435.

On January 1, 1920, plaintiff issued 600,000 shares of its stock for the stock of two corporations and on March 15, 1920, it also issued 600,000 shares of its stock for the stock of certain other corporations and the controversy relates to determination of the actual cash value of that tangible property (stock) paid in for plaintiff's stock on those dates. In the certificate of overassessment and check for the overpayment above referred to which were rejected by plaintiff and later canceled by the Commissioner, the Commissioner declined to take into account and give effect, for invested capital purposes, to a fair market value claimed by plaintiff for the capital stock of these corporations but he did determine invested capital on account of the acquisition of these stocks on what he determined to be the actual cash value on the basis of the value of the assets behind such stock. On that basis the Commissioner allowed, as above stated, an addition to invested capital on account of the first acquisition of $3,333,333.33, and on account of the second acquisition of $2,393,442.62, whereas plaintiff contended then and now contends that the actual cash value of the stock paid in in the first acquisition was $4,499,995, and in the second acquisition $6,075,000. The second acquisition was in the consolidated group for only a part of the year, that is, from March 15, 1920, and when appropriate adjustment is made therefor the addition to invested capital on account of that acquisition, as claimed by plaintiff, amounts to $4,846,721.31. The total additions to invested capital on account of the two acquisitions as determined by the Commissioner amounted to $5,726,775.95, whereas the total claimed by plaintiff amounts to $9,346,716.31.

■ Little, if any, evidence was presented as to the cash value of the stocks paid in, that is, such as what their past history of earnings was, what assets were back of this stock, or what the prevailing market prices were for these stocks. Plaintiff presents and relies almost exclusively on the curb market prices for its own stock which prevailed on or about the basic dates in question, which it contends, as it had contended before the Commissioner, show an actual cash value of its own stock on January 1, 1920, of approximately $7.50 per share, and on March 15, 1920, of $10⅛ per share. It says that therefore the actual cash values of the stock paid in for its stock are to be measured by these market prices for its own stock. If we assume without deciding that the cash value of plaintiff's stock is a proper basis of valuing the stock paid in, we are nevertheless unable to agree that, in the circumstances which prevailed in this case, the curb market prices alone are sufficient to substantiate and justify the allowance of a cash value based on those prevailing prices. It is of course true that in many cases prevailing market prices are an acceptable basis for determining value. However, we are here concerned with oil stocks which not only are ordinarily of a highly speculative nature but also the corporations were at that time being brought together in a new operation. We do not therefore have either a past history of sales of stock or a past history of operations as guides in considering these stocks. That they were highly speculative is shown by the fact that

within a short time after the basic dates in question many of the bright pictures painted by the brokers who were selling the new stock of plaintiff had been found unwarranted. The market which prevailed was strongly supported by certain New York curb brokers who were dealing in this stock and in addition there was a restrictive agreement in effect which prevented a large block of the stock from being offered for sale during the period we are asked to value the stock.

No more persuasive argument against acceptance of these curb market prices as a basis of valuation need be offered than that presented by the plaintiff when the Commissioner sought to use these and similar prices to fix a fair value for this stock for capital stock tax purposes on July 1, 1920. The plaintiff had used a par value of $5 per share, whereas the Commissioner sought to increase that value by the use of the prevailing curb market prices. Plaintiff submitted arguments in opposition to such an increase similar to the considerations we have set out above as showing the unreliability of such market quotations in the peculiar circumstances of this case. The Commissioner receded from his position after the receipt of those arguments and allowed the valuation of $5 a share to stand as shown in the original capital stock tax return. That valuation was, of course, for a somewhat later date, July 1, 1920, and for a different purpose, but the arguments advanced by plaintiff covered the period with which we are here concerned and also some of the market prices with which we are dealing. We do not say that as a result of what occurred at that time plaintiff is estopped to take a different position in this proceeding which concerns an entirely different determination, but we are convinced that the arguments there advanced against relying on these curb market stock quotations as a guide for valuing the stock are sound.

■ Whether the term "actual cash value," as used in the governing statute, is something different from the term "fair market value," it is not necessary to decide. We think, however, that it emphasizes the fact that in determining invested capital all speculative or inflationary values are to be eliminated and an actual sound value of the property paid in must be established. Cf. La Belle Iron Works v. United States, 55 Ct.Cl. 462, affirmed 256 U.S. 377, 41 S. Ct. 528, 65 L.Ed. 998. Merely because

some of this stock was being bought and sold on the Curb Exchange in a broker-supported market is not sufficient evidence to convince us that the actual cash value of tangible property paid in for that stock can be fully and satisfactorily measured by such prices.

■■ We are, however, convinced from the record that plaintiff is entitled to some increase in its invested capital for 1920 on account of these stock acquisitions over that allowed by the Commissioner when he rejected the claim for refund in full on December 13, 1941. Prior to that time and after the invested capital and income of the second group had been excluded from the consolidated return, the Commissioner re-audited the return in connection with the claim for refund and determined and allowed additions to invested capital on account of the two acquisitions in the respective amounts of $3,333,333.33 and $2,393,-442.62. While the certificate of overassessment and the refund check for a total of $17,255.06, based on that determination were rejected by plaintiff and later canceled by the Commissioner, we are convinced that the amounts and values determined and allowed at that time represented reasonable additions to invested capital on account of the actual value of property paid in at the times in question. The fact that they are based on the valuation of the assets back of the stock, rather than an attempt to value the stock itself, does not mitigate against their use as evidence in determining value; that was the best evidence available. In that determination the Commissioner computed an adjusted invested capital of $7,-926,731.74 which we likewise are satisfied was fair and reasonable, and have so found as a fact. The parties have stipulated that the consolidated net income of plaintiff for the calendar year 1920 is the sum of $1,-087,025.43. On the basis of that net income and the invested capital as above-mentioned, the correct tax liability for 1920 is $188,550.46. The difference between that amount and the tax which has been paid, $200,707.45, is $12,156.99, which constitutes an overpayment.

■ It accordingly follows that plaintiff, Continental Oil Company, is entitled to recover an overpayment in the amount of $12,156.99, plus interest at 6% per annum from December 16, 1921, the date of payment, to a date not later than 30 days preceding the issuance of the refund check which plaintiff rejected, which interest was

a part of the interest of $4,475.09 heretofore tendered by the Commissioner in that refund check. Since the amount of this overpayment and the amount of interest due thereon were tendered to plaintiff, it is not entitled to any additional interest under section 177 (b) of the Judicial Code, as amended by sec. 615 (a) of the Revenue Act of 1928, 28 U.S.C.A. § 284 (b).

Judgment is entered in favor of plaintiff, Continental Oil Company, for $12,156.-99 with interest computed as above stated.

The petition as to Robinson Verrill, etc., No. 46029, is dismissed. It is so ordered.

WHALEY, Chief Justice, and WHITAKER, Judge, concur.

MADDEN and JONES, Judges, took no part in the decision of this case.